355 F.2d 495
 The A.L.B. THEATRE CORPORATION, a corporation, Plaintiff-Appellant,
v.
LOEW'S INCORPORATED, a corporation, Universal Film Exchanges Inc., a corporation, Warner Bros. Pictures Distributing Corporation, a corporation, United Artists Corporation, a corporation, Columbia Pictures Corporation, a corporation, Twentieth Century-Fox Film Corporation, a corporation, Paramount Film Distributing Corporation, a corporation, and Balaban & Katz Corporation, a corporation, Defendants-Appellees.
 No. 14754.
 United States Court of Appeals Seventh Circuit.
 January 17, 1966.
 
 1
 Howard Hoosin, Seymour F. Simon, Morris J. Wexler, Chicago, Ill., for appellant.
 
 
 2
 Miles G. Seeley, Richard F. Hart, Chicago, Ill., for defendants-appellees, Loew's Incorporated, a corporation, Universal Film Exchanges, Inc., a corporation, Warner Bros. Pictures Distributing Corporation, a corporation, United Artists Corporation, a corporation, and Columbia Pictures Corporation, a corporation.
 
 
 3
 Samuel W. Block, Keith F. Bode, Chicago, Ill., for defendants-appellees, Paramount Film Distributing Corporation, a corporation, and Balaban & Katz Corporation, a corporation.
 
 
 4
 Robert W. Bergstrom, Charles O. Brizius, Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Raymond, Mayer, Jenner & Block, Bergstrom, Brizius & Olson, Chicago, Ill., of counsel, for defendant-appellee, Twentieth Century-Fox Film Corporation, a corporation.
 
 
 5
 Before SCHNACKENBERG and KNOCH, Circuit Judges, and MERCER, District Judge.
 
 
 6
 MERCER, District Judge.
 
 
 7
 The genealogy of this suit must be traced from the decision in Bigelow v. RKO Radio Pictures, 7 Cir., 162 F.2d 520, cert. denied in 332 U.S. 817, 68 S. Ct. 158, 92 L.Ed. 394 in which the so-called "Chicago system of release" of motion picture films was enjoined as a violation of the anti-trust laws. Under the "Chicago system" all theatres in the City were classified under a caste system, within which no theatre could book a film except on the particular run which it was authorized under the system to play. On Chicago's north side, practically all first outlying runs of pictures, i. e., outside Chicago's Loop, were licensed to five theatres owned by the motion picture distributors and operated by Balaban & Katz Corporation, hereinafter B & K.
 
 
 8
 As a matter of industry practice, motion picture films are released for successive runs or clearances, beginning in the major metropolitan areas with a premiere exhibition in a major theatre in the downtown sector. Thereafter, the film is released on "first outlying run", or exhibition in a number of neighborhood theatres outside the central area of the city. The second outlying run, which is exhibited in a greater number of theatres than is the first, follows, etc. Eventually, the particular film is available on general release to all who desire it and who pay a flat-rate rental for exhibition. Thus, the rental value of any given film decreases in direct proportion to the extent of prior public exposure to the exhibited film, and the higher the run the more desirable the run from the exhibitor's point of view.
 
 
 9
 The Bigelow decision became effective on December 1, 1947. In January, 1948, Twentieth Century-Fox Film Corporation, hereinafter Fox, divided the City of Chicago into a number of competitive areas which it called "major key zones." After its Loop run, each film was made available for exhibition on first outlying run at one theatre in each of those major key zones. The film was rented for exhibition in each zone on the basis of sealed bids for rental thereof submitted by the theatres located within the zone.
 
 
 10
 Fox's major key zone 2 comprised that portion of the North side of Chicago north of Fullerton Avenue and east of Western Avenue, an area of about six and one-half miles from north to south and from one and one-half miles at the south end to three miles at the north end east to west.
 
 
 11
 Each of the other major distributors of motion pictures followed Fox's lead in establishing methods of competitive bidding for the first outlying run and subsequent runs of its products. Some grouped theatres in particular areas which might bid against each other for each successive run of their pictures, while others adopted geographical lines or zones, with all theatres in each such zone having an opportunity to bid against all other theatres in the zone for a license to exhibit each film on each successive outlying run. In general, the different competitive areas established by the major distributors of films followed closely the geographical location and configuration of the original Fox zones.
 
 
 12
 One major exception to the geographic zone concept was a plan devised by RKO Theatres under which RKO would license a film for first outlying run to any theatre submitting a bid for a particular picture above a stated minimum, except that when two qualified bids were received from theatres located within one and one-half miles of each other only the highest bid would be accepted.
 
 
 13
 As originally conceived, the Fox major key zone 2 included some 43 theatres, including the Uptown, Belmont, Century and Covent Theatres, all of which were at that time operated by B & K, plus a number of independent theatres. Until May, 1949, only one first outlying run license was issued for each film for the whole area by the major distributors. At that time the Ridge Theatre, an independent theatre located near the north end of the zone, requested of all major distributors that it be placed in a smaller bidding area where it would not have to compete against the Uptown Theatre for first outlying run pictures. In response to that demand, each of the major distributors created a new bidding area comprised of approximately the northern one-third of the previously established zone. At about the same time B & K requested all distributors to divide the north side zone so that its Uptown Theatre and its Century Theatre could compete in separate zones for the first outlying run of films. In response to that request, during the month of June and July, 1949, the major distributors, except Loew's, divided the southern twothirds of the original north-side zone thus creating two zones or competitive bidding areas. Though the definitive changes effected differed from distributor to distributor, in each case the Uptown, Vogue, and North Center Theatres were placed in one bidding zone, while the Belmont, Century and Covent were placed in a separate zone. In 1952, Loew's revised its competitive bidding structure on the north side to parallel that of the other major distributors in the area which formerly comprised the Fox major key zone 2.
 
 
 14
 In the period from 1948 to 1955, the releasing situation of the major distributors was in a state of considerable flux. At the outset, only some twelve theatres in the City of Chicago could play any picture simultaneously on the first outlying run. Subsequently the bidding areas were revised to such extent that each picture was made available to some sixty-five theatres simultaneously for first outlying run.
 
 
 15
 Until October 31, 1955, B & K operated the Belmont Theatre and the Century Theatre which were located slightly more than one and one-half miles apart. Prior to 1949, when both of these theatres were competing against the B & K Uptown for first outlying runs, B & K exhibited motion pictures at each of those theatres only on second outlying run. After June, 1949, B & K exhibited pictures on a first outlying run basis at both the Belmont and the Century, but never the same picture at the same time.
 
 
 16
 In 1955, plaintiff corporation was created after which it entered into negotiations to lease the Belmont Theatre on the expiration of the lease of B & K. On October 31, 1955, plaintiff signed a lease for the theatre for an annual rental of $50,400.00, plus 5% of the annual concession income. The plaintiff corporation was capitalized at $25,000.00. It borrowed an additional $25,000.00 from the operator of the concessions in the theatre, which was placed on deposit with the landlord of the theatre to be used by him to remodel and improve the theatre.
 
 
 17
 On October 31, 1955, an attorney for plaintiff wrote to all major distributors demanding immediate and independent access to the Belmont for all first-run pictures. That letter was followed by a series of written demands to the distributors that they refrain from granting to other theatres any clearance or other priority with respect to any film which would prevent the simultaneous showing of that film at the Belmont. When its demands were refused by each of the several distributors, plaintiff submitted bids on first outlying run films which it desired to show with the statement, in effect, that if the plaintiff's bids were accepted, it would not demand any clearance over any other theatre or object to the simultaneous showing of such film in any other theatre in the City of Chicago.
 
 
 18
 The response of the several distributor defendants to the demands of the plaintiff differed, but all, in effect, advised the plaintiff, that it could submit bids against the Century, Covent and other theatres in the established competitive area upon any motion picture offered by each such distributor and on any run which plaintiff desired for such film.
 
 
 19
 Plaintiff operated the Belmont until January 31, 1957. At that time plaintiff was insolvent and was evicted from the theatre for non-payment of rent.
 
 
 20
 Thereafter this suit for treble damages was filed. Defendants are Loew's Incorporated, Universal Film Exchanges, Inc., Warner Bros. Pictures Distributing Corporation, United Artists Corporation, Columbia Pictures Corporation, Twentieth Century-Fox Film Corporation, Paramount Film Distributing Corporation and Balaban & Katz Corporation. Hereinafter, for convenience the defendants are referred to as Loew's, Universal, Warner, U.A., Columbia, Fox, Paramount and B & K, respectively.
 
 
 21
 The theory of plaintiff's complaint was that the 7 distributor defendants, namely, Loew's, Universal, Warner, U.A., Columbia, Fox and Paramount, had in 1949 entered into a conspiracy among themselves and with the exhibitor defendant, B & K, creating an exclusive zone of exhibition in which the Belmont was required to bid against the Century and other theatres for motion pictures which it desired to play.
 
 
 22
 Following a lengthy trial, the defendants moved for judgment in their favor when the plaintiff rested its case. When the court overruled their motions, each of the defendants rested without adducing any evidence. Thereafter the trial judge entered extensive findings of fact, finding, inter alia, that plaintiff had failed to prove the existence of the alleged conspiracy and that it failed to prove its allegation that the defendants were violating the antitrust laws. Judgment was entered dismissing the complaint and this appeal followed.
 
 
 23
 Several issues on this appeal are variously stated by the competing parties, but these resolve themselves into the one central issue whether the trial court's findings of fact are clearly erroneous.
 
 
 24
 The trial court was the trier of the facts. The duty devolved upon that court to weigh the evidence and accord it such weight and probative value as the court believed it deserved. There was no compulsion to view the evidence in the light most favorable to plaintiff. We are not at liberty to disturb the trial court's choice between opposed, permissible inferences whenever from the evidence conflicting inferences may be drawn. Penn-Texas Corp. v. Morse, 7 Cir., 242 F.2d 243, 246-247. The findings of fact, either directly from the uncontradicted evidence adduced, or inferentially from circumstances, or upon conflicting evidence, may not be set aside unless we are convinced that they are clearly erroneous. Fed.R.Civ.Proc. 52 (a), 28 U.S.C.A.; Berolzheimer v. Heil Co., 7 Cir., 340 F.2d 122.
 
 
 25
 Essentially, plaintiff challenges three basic findings, namely, that plaintiff had failed to prove the existence of a conspiracy, that the zone of exhibition in which plaintiff was placed was not unreasonably defined and that the Belmont was competitive with the B & K Century.
 
 
 26
 We will not attempt to restate the exhaustive evidentiary findings of the court below, but will merely summarize the evidence sufficiently to support our view that the ultimate findings of which complaint is made are not clearly erroneous.
 
 
 27
 There is lacking essentially any iota of proof that the distributor defendants conspired together and/or with B & K in the establishment of the zone of competition which the distributor defendants uniformly adopted in the area involved. The impetus of the Bigelow decision required them to adopt an entirely new system of film distribution. The evidence indicates that Fox in January, 1949, first adopted the north side zone from which the area in dispute was subsequently carved, and that each of the distributor defendants adopted a comparable zone of exhibition on the north side. There is no positive proof that these defendants conferred together in the establishment of the zone or that there was any agreement among themselves, or with B & K, that a uniform zone of exhibition would be maintained in the area. On the other hand, agents of these defendants called as witnesses by plaintiff each testified that his company did not confer or discuss with the other distributor defendants or with B & K the establishment and maintenance of licensing zones.
 
 
 28
 The nature of the motion picture distribution industry and the special considerations connected therewith were recognized by the court in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and cases subsequent thereto. Prints of a film have a rental value for exhibition which decreases in proportion to public exposure to the projected film. Reasonable successive runs of the film and clearances, i. e., the exclusive right of exhibition over competing theatres, on a given run, are permissible business practices when they bear a reasonable, business relationship to competitive factors which justify them. United States v. Paramount Pictures, supra.
 
 
 29
 The economic and social forces bearing upon each of the distributor defendants compelled each of them to exercise business judgment in their quest for the most advantageous system of release of films consistent with the restraint imposed by Bigelow. The establishment of competitive zones for release is compatible with the conclusion that those zones were fixed by individual action, though such action was consciously parallel to the solution adopted by others.
 
 
 30
 Proof of conscious parallelism, standing alone, is not conclusive proof of conspiratorial action. The question is whether the object of the action taken by each distributor is a reasonable solution to the business problem with which it was faced. In that regard, we subscribe to the views expressed in two of the most exhaustive opinions dealing with this subject as expressive of the criteria which properly control the review of this case. Orbo Theatre Corp. v. Loew's Inc., D.D.C., 156 F.Supp. 770, 775, aff'd 104 U.S.App.D.C. 262, 261 F.2d 380, cert. denied 359 U.S. 943, 79 S.Ct. 725, 3 L.Ed. 2d 677; Fanchon & Marco, Inc. v. Paramount Pictures, S.D.Calif., 100 F.Supp. 84, 92-104, aff'd, 9 Cir., 215 F.2d 167, cert. denied 348 U.S. 912, 75 S.Ct. 293, 99 L.Ed. 715.
 
 
 31
 Here the competitive bidding situation between the Belmont and Century was created in 1949 (1952 by Loew's) at times when both theatres were under common management by B & K. It can hardly be argued that at that point the defendants entered into a conspiracy to injure the plaintiff, a then non-existent corporation which lacked, it may be presumed, even the spark of creation in the minds of those who, ultimately, became its incorporators. Moreover, the action taken by each of the distributors in 1949 and 1952 had the effect of creating a more advantageous competitive situation for both the Belmont and the Century than those theatres had previously enjoyed.
 
 
 32
 In 1955, enter the plaintiff. By the admission of its officers, plaintiff acted with the intent of booking only the choicest products available on a first out-lying run basis, but without making any prior inquiry as to the basis upon which such films could be obtained. Plaintiff leased the Belmont at a rental of approximately $1,000.00 per month above the rental which B & K had paid and arranged to borrow money for the purpose of extensive remodeling, all without any prior inquiry as to the prospect of renting the films which it hoped to show.
 
 
 33
 It was not denied the right to compete for any picture it wanted. What it was required to do was to submit written bids for films in competition with all other theatres in the zone which chose to bid on a particular film.
 
 
 34
 At no time during its short life did plaintiff request that it be transferred from the zone including the Century to some other zone. What it did request, and even demand, was that the distributors abandon the concept of clearances and license to plaintiff any film which it desired to show. Each of the distributors refused so to do by unilateral action which the trial court described fully in its findings of fact. The action taken by the distributor defendants ranged from correspondence rejecting the suggestion, to, in the case of Warner, simply ignoring the repeated requests of plaintiff that the system of clearances be abolished. In the meantime, all offered to plaintiff their product on a competitive basis.
 
 
 35
 Plaintiff bid on many of the films offered. In some cases its bids were accepted. In others its bids were rejected and the particular films were licensed on first outlying run to the Century or another theatre.
 
 
 36
 We find no evidence in the record from which we must conclude that the bidding was conspiratorially conducted in favor of the Century to the injury of plaintiff. Bids of the competing parties were of three principal types, namely, a stated cash rental, or a percentage of gross box-office receipts, or a guaranteed minimum cash rental against a percentage of gross receipts. A comparison of the bids made by the Century and Belmont disclose substantial divergence between certain bids, and substantial similarity between others. In many instances, the bids presented the distributor with the necessity of weighing a straight percentage bid from one theatre against a flat rental or a guaranteed minimum rental from another. There are, of course, instances in which a Century bid was accepted which proved to be less lucrative than the Belmont bid, but there is no evidence that these isolated instances reflect anything other than the exercise of business judgment which, in retrospect, proved to be wrong. Such isolated instances do not lead inevitably to the view that there was anything unlawful in the decision made.
 
 
 37
 The Century and the Belmont were fourteen blocks apart. Travel from one to the other involved a few minutes time by public or private transport and somewhat less than one-half hour to a person walking. There can be no question that the evidence sustains the finding that each competed against the other for public patronage. It cannot thus be said that it was unreasonable to include the two theatres in the same market area and to grant to each clearances over the other on motion pictures licensed to them.
 
 
 38
 It does appear that both the Belmont and the Century operated at a loss during the period while the Belmont was operated by plaintiff. It may well be that the two engaged in a course of ruinous bidding in their competition with each other for the choicest films. Be that as it may, competition is the soul of the antitrust laws and no exhibitor can invoke those laws as a tool to compel distributors to discriminate in his favor. Milwaukee Towne Corp. v. Loew's Inc., 7 Cir., 190 F.2d 561, 571-572, cert. denied 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680; Loew's Inc. v. Milwaukee Towne Corp., 7 Cir., 201 F.2d 19, 23-25, cert. denied 345 U.S. 951, 73 S.Ct. 865, 97 L.Ed. 1374; Bigelow v. Loew's Inc., 7 Cir., 201 F.2d 25, 27-28, cert. denied 345 U.S. 950, 73 S.Ct. 865, 97 L.Ed. 1373.
 
 
 39
 The fact that the Century bid more for given films than the rental paid by other B & K theatres in Chicago for the same film has no probative tendency to show a conspiracy to injure plaintiff. The competitive situation varied from area to area, and it is to be presumed that all exhibitors, including plaintiff, geared their bids to what they considered to be the rental necessary to procure the choicest pictures for exhibition.
 
 
 40
 To the extent that the record indicates that rebates on film rentals were given to B & K and other exhibitors, the records tend to indicate that those resulted from renegotiation of noncompetitive rentals in the light of actual box office gross for a particular film.
 
 
 41
 Plaintiff was capitalized at $25,000.00. It borrowed $25,000 from its concessionaire which it used in remodeling the theatre. Of its incorporators and principal officers, only two had had any experience in the field. That experience was limited to the operation of small suburban theatres which showed general release pictures acquired on a nominal, flat-rate rental.
 
 
 42
 During its operation of the Belmont, plaintiff exhibited first outlying run films, second outlying run films and reissue films from time to time. As one of its principal officers testified, there was not a single week of its operation when box office receipts were equal to its film rental and general operating expenses. Its eventual insolvency may well be attributed to the inexperience and poor business judgment of its officers, in entering an area of competition without any investigation of the competitive facts of life while undertaking the burden of exceptionally high theatre rent and the obligation of a loan equal to the total capitalization of the corporation.
 
 
 43
 Plaintiff's argument that the zones of first run exhibition were arbitrarily and rigidly fixed will not survive examination of the record. Each distributor devised the zones as business interests dictated and in response to reasonable requests of exhibitors. As we have noted, the north side zone was divided into three smaller zones in 1949 in response to exhibitor requests. Further, all distributors honored a request by the Vogue Theatre in 1954 that it be transferred from the zone containing the Uptown to the Century-Belmont zone. In the light of those changes, and the fact that plaintiff at no time requested that the Belmont be removed from the zone with the Century, we do not understand how plaintiff can now say that the zones of exhibition were inflexibly fixed to its injury.
 
 
 44
 Each of the distributors simply refused to abandon the established system of clearances. So long as the zones of exhibition bear a reasonable relationship to business dictates, the system of clearances is a valid practice.
 
 
 45
 We have reviewed the line of cases in this Circuit beginning with Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 162 F.2d 520, cert. denied 332 U.S. 817, 68 S.Ct. 158, interpreting and applying the Bigelow decree and the decision in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, to antitrust litigation in this field. Bigelow v. Twentieth Century-Fox Film Corporation, 7 Cir., 183 F.2d 60; Milwaukee Towne Corp. v. Loew's Inc., 7 Cir., 190 F.2d 561, cert. denied 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680; Loew's Inc. v. Milwaukee Towne Corp., 7 Cir., 201 F.2d 19, cert. denied 345 U.S. 951, 73 S.Ct. 865; Bigelow v. Loew's Inc., 7 Cir., 201 F.2d 25, cert. denied 345 U.S. 950, 73 S.Ct. 865; Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 205 F.2d 231. The instant decision is consistent with the decisions in that line of cases. This record shows that plaintiff was afforded the right to bid for films in a free, competitive market. That is all that the antitrust laws require. Royster Drive-In Theatres, Inc. v. American Broadcast, Etc., 2 Cir., 268 F.2d 246; accord, Bigelow v. Loew's Inc., 7 Cir., 201 F.2d 25, 28, cert. denied 345 U.S. 950, 73 S.Ct. 865, 97 L.Ed. 1373.
 
 
 46
 This case is not comparable to the case of William Goldman Theatres v. Loew's Inc., 3 Cir., 150 F.2d 738, upon which plaintiff relies. There the distributors had contracted all licenses for first run pictures to a single exhibitor and denied the plaintiff the right to compete for the product.
 
 
 47
 Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp., 9 Cir., 264 F.2d 602, may be factually similar to this case as plaintiff argues, but there does exist the big distinction that the trier of the facts there found a conspiracy to have been proved. To the argument that Paradise was factually indistinguishable from Fanchon & Marco, Inc. v. Paramount Pictures, 9 Cir., 215 F.2d 167, the court stated in Paradise that it could not reverse a decision simply because the triers of fact in two separate cases had reached opposite results on considering substantially similar evidence. 264 F.2d at 605.
 
 
 48
 The stature of this suit is not changed by the fact that the defendants offered no evidence. They were entitled to rely on the weaknesses of the plaintiff's proof and the evidence adduced by the plaintiff to support their right to a judgment in their favor.
 
 
 49
 Since the findings of the court below are adequately supported by the evidence, we are without power to interfere with its judgment.
 
 
 50
 Judgment affirmed.