SYUFY ENTERPRISES, a partnership, successor in interest to original plaintiffs, Las Vegas Drive-In Theatre, Inc., Smoke Ranch Drive-In Theatre, Inc., Las Vegas Theatre Corporation, and Confection Corporation of Las Vegas, Inc., Appellant,

v.

NATIONAL GENERAL THEATRES, INC., ABC Intermountain Theatre Co., Nevada Theatre Corporation, Southwest Amusement Corporation, Lucille Marleau Cragin, d/b/a El Portal Theatre, and Las Vegas Cinerama Theatre Co., Appellees.

No. 76–2003.

United States Court of Appeals,
Ninth Circuit.

April 7, 1978.

Rehearing and Rehearing En Banc
Denied May 18, 1978.

Joseph M. Alioto (argued), San Francisco, Cal., for appellant.

Harry B. Swerdlow (argued), of Swerdlow, Glikbarg & Shimer, Beverly Hills, Cal., for appellees.

Before KILKENNY and GOODWIN, Circuit Judges, and MURRAY, District Judge.*

KILKENNY, Senior Circuit Judge:

Appellant appeals from a directed verdict granted on its antitrust claim against appellees. The district court concluded that the evidence of violation of § 1 of the Sherman Act, 15 U.S.C. § 1, was insufficient. We affirm.

## FACTS

This action was filed in federal district court in 1971 alleging violations of §§ 1 and 2[1] of the Sherman Act. In essence, the complaint charged certain Las Vegas theatre owners of conspiring with non-named film distributors to confine the exhibition of first run films to appellees' theatres. In addition, appellees were charged with secretly agreeing to divide first run films among themselves to the exclusion of the appellant. Appellees answered and also counterclaimed alleging that the appellant had engaged in abuse of the litigation process. The trial before a jury commenced in 1975, and at the conclusion of the appellant's case the court granted appellees' motion for a directed verdict. Appellant filed a notice of appeal which was dismissed without prejudice in light of the pending counterclaim. The counterclaim went to trial in 1976, and appellant's motion for mistrial was granted. The counterclaim was then severed from the original complaint allowing for this appeal.

## THE LAS VEGAS THEATRE MARKET

Appellant entered the theatre business in Las Vegas in 1966 when it opened the Las Vegas Drive In. Four of the named appellees were operating theatres at that time, the Nevada Theatre Corporation [NTC], National General Theatres [National General], Las Vegas Cinerama [Cinerama], and Cragin. (Hereinafter collectively referred to as exhibitors.) All of these appellees were operating conventional indoor theatres when the appellant opened its drive-in theatre. There were two other drive-ins in Las Vegas in 1966, one operated by National General and the other by a non-party. Another named appellee, ABC Intermountain Theatre Co. [ABC], opened its first Las Vegas theatre in 1970.[2] The record does show that during the 1966–1971 period there was at least one other theatre, the Bonanza, operating in the Las Vegas market.

During the five years preceding this action Las Vegas theatre owners drifted in and out of so called "split agreements." As defined by the district court a split is an arrangement among participating exhibitors in a market area entered into with the knowledge and consent of distributors. The participants therein agree that a member thereof shall have the first right to negotiate with a licensing distributor. A split can be by company or by picture. In a company split, the participating exhibitors agree that a member thereof shall have the right to negotiate for the pictures released by a given company prior to any other members doing so. In a picture split, the participants agree that a member thereof shall have the right to negotiate for a particular picture prior to the other members so doing. From 1951 to 1965 there were only two exhibitors in Las Vegas, and they were parties to a split agreement. During 1966 and 1967 there was no split agreement, and all theatre owners competed freely for films. In 1968 another split agreement was born among National General, Cragin, and NTC. The split dissolved, and for all of 1969 and 1970 the Las Vegas exhibitors again bid without restraint for their films. In 1971 all of the named appellees, as well as the appellant, formed yet another split agreement. Appellant withdrew later that year and filed this claim. At no time was the Bonanza Theatre a party to any split

* The Honorable William D. Murray, Senior United States District Judge for the District of Montana, sitting by designation.

1. The § 2 claim was not pursued.

2. Appellant introduced no proof as to Southwest Amusement Corporation.

agreement. Appellant does not challenge nor would such a challenge be sustained to the various split agreements. *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 20 (CA9 1971).

In addition to the split agreements, the process of procuring a motion picture for showing in a particular theatre is complicated by the terms of the distributor's contract with the individual exhibitor. Generally, distributors ask for bids on all their films. They can seek bids on at least three sets of terms. First, the distributor can extend bid invitations to an exhibitor on an "exclusive" basis. As the district court found, a picture exhibited on an exclusive basis is shown at only one theatre in any one particular market area. Second, the distributor can offer to bid the film on a "day/date" basis. This would mean that the film would be shown at more than one theatre, either drive-in or conventional, in a given market area at any one time. Third, the distributor could offer the film to bidders under either plan and then decide which one to accept. This is commonly referred to as "either/or" bidding. The decision on how to offer films for bids and what bids to accept rests solely with the distributor.

The business reasons for the differing types of exhibition contracts are obvious. The day and date allows the theatre owners to submit lower bids for films since they will not have the exclusive showing rights. This is balanced by the fact that the theatres using day and date will be competing for the same customers. The exclusive showing rights afford just the opposite considerations. Exhibitors pay higher film rental rates, but are guaranteed exclusivity. In addition, the distributors will have a greater opportunity to profit from second showings in other theatres if the first run was on an exclusive basis.

The appellant contends that the named appellees agreed not to bid for films on a day/date basis. Consequently, appellant charges that it was forced to bid for all films on an exclusive basis. Appellant claims that it was new to the Las Vegas theatre market, and consequently was unable to offer the sort of past attendance figures to allow it to bid successfully for most exclusive pictures. The district court found that there was no evidence to show that the appellees had conspired to refuse to bid day/date to the detriment of the appellant. We agree.

## STANDARD OF REVIEW

■ Since this matter is before the court from the entry of a directed verdict, our standard of review is quite strict. Our recent opinion in *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674 (CA9 1976), *cert. denied* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309, accurately describes our task:

> "Our inquiry, therefore, is not whether there is substantial evidence supporting a finding of independent business purpose, but whether no reasonable jury could have found that Distributor participated in a conspiracy to restrain trade. The burden is on the party moving for summary judgment to show the absence of any genuine issue of material fact, and, in determining whether the burden has been met, we must draw all inferences of fact against the movant and in favor of the party opposing the motion." at 683.

Although this language speaks with respect to a motion for summary judgment, the *Calnetics* court properly expanded it to review of directed verdicts. *See also, Santa Clara Valley Distributing Co. v. Pabst Brewing Co.,* 556 F.2d 942, 944 (CA9 1977).

## EXHIBITORS' INVOLVEMENT

■ Appellant offered two witnesses to prove there was an agreement among Las Vegas theatre owners not to bid day/date for films to be shown in their market. The first witness was one Shane, former head booking agent at National General. His testimony is somewhat ambiguous, but a fair reading does not show the existence of any agreement among the appellees to refuse to bid day/date with appellant. The other witness offered to prove the conspiracy was the appellant himself. He suggested that several employees of the appellees had told him that they could not bid on a

day/date basis for films because of an agreement between the various appellees. The distributors were not mentioned. Again the record is devoid of any substantial proof of an actionable conspiracy. Rather, the testimony of officials of the various exhibitors demonstrates that each theatre had a formal individual policy of bidding for films on an exclusive basis only.

■ While it is true that the film exhibitors all refused to bid for films on a day/date basis, this mere parallel conduct, in and of itself, does not equate with proof of a conspiracy. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Dahl, Inc. v. Roy Cooper Co., supra; C–O Two Fire Equipment Co. v. United States,* 197 F.2d 489 (CA9 1952), *cert. denied* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690. The testimony indicated that there were various independent business reasons for choosing to bid for films on an exclusive only basis. Proof of mere parallel action on this record is insufficient. Furthermore, the testimony shows that the . Bonanza theatre, not charged to have been a member of the alleged illegal conspiracy, at all relevant times chose not to bid for films on a day/date basis despite appellant's requests that it do so. We can only assume that the independent business motivation for offering films on an exclusive basis was behind Bonanza's decision.

## DISTRIBUTORS' INVOLVEMENT

■ It is the distributors' absolute control over film exhibition that fully exposes the fatal flaw in appellant's arguments. As we have noted, the motion picture distributors decide how to offer films to the exhibitors and just what bids to accept, yet they are not defendants nor charged with the conspiracy. Since the exhibitor can only bid for films consistent with the distributors' bid invitation, the appellant must show that films were offered for bids on a day/date basis in the Las Vegas area before it could prove that the appellees had conspired not to bid for the films on a day/date basis. Here appellant offered no evidence that films were available on a day/date basis. In fact, on cross-examination appellant admitted that the large majority of films offered for bids during the 1967–1971 period were available on an exclusive basis only. Manifestly, the appellees could not conspire to refuse to bid on something that was not available to them. *A.L.B. Theatre Corp. v. Loew's Inc.,* 355 F.2d 495 (CA7 1966).

■ Moreover, appellant has failed to show that there was anything but an individual decision on the part of each distributor to offer films on an exclusive basis only. While the record does indicate that a distributor's decision on the method of offering its films to exhibitors may be influenced by the exhibitors themselves, there is no evidence to suggest that the appellees in any way dictated distributor policy. A mere refusal by an individual distributor to offer films on a day/date basis without an agreement does not violate the antitrust laws. *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1220 (CA9 1977), and *Dahl, Inc. v. Roy Cooper Co., supra.*

## DAMAGES

In the light of the above conclusions, we do not reach the issue of damages.

## CONCLUSION

The judgment of the district court must be affirmed.

IT IS SO ORDERED.