Renee **WRIGHT, as Special Administratrix of the Estate of Jan Jaroslav Stehlik, Plaintiff,**

v.

**SOUTHERN MONO HOSPITAL DISTRICT dba Mammoth Hospital District, Inc., Otis Clasby, Floyd B. Parks, M.D., James Vawter, M.D., Karen Tierney, M.D., Defendants.**

No. Civ. S–83–543 RAR.

United States District Court, E.D. California.

April 1, 1986.

Gerald H. Gottlieb, Beverly Hills, Cal., Ralph D. Drayton, Sacramento, Cal., for plaintiff.

Thomas E. Lotz, Harrington, Foxx, Durbrow, Canter & Keene, Los Angeles, Cal., Raymond Moore, Hagenbaugh & Murphy, Los Angeles, Cal., for defendants.

## ORDER

RAMIREZ, District Judge.

On September 25, 1985, the above-entitled matter came on regularly for hearing before the undersigned on defendants' motions for summary judgment. Ralph Drayton, Esq. and Gerald Gottlieb, Esq., appeared as counsel for plaintiff, RENEE WRIGHT. Thomas E. Lotz, Esq., appeared as counsel for defendants, MAMMOTH HOSPITAL DISTRICT, INC.,[1] OTIS CLASBY, JAMES VAWTER, M.D., and KAREN TIERNEY, M.D. Raymond R. Moore, Esq., appeared as counsel for defendant, FLOYD B. PARKS, M.D. Having read and considered the voluminous briefs and arguments presented by respective counsel, the court herein renders the following ruling:

## PROCEDURAL AND FACTUAL BACKGROUND

The original complaint in the underlying action was filed on May 20, 1983. After considering defendants' motions to dismiss and plaintiff's motion for reconsideration, a third amended complaint was filed by plaintiff on December 17, 1984. The following pertinent facts are gleaned from the third amended complaint as well as from the briefs, depositions, declarations, and exhibits filed by respective counsel:[2]

### 1. The Civil Rights Violations

In July 1981, the original plaintiff and now deceased Jan Stehlik began the practice of medicine in Mammoth Lakes, California. See Plaintiff's Vol. III, p. 29–30. At said time and place, defendant, Mammoth Hospital District, Inc. (Mammoth Hospital), was a public hospital in Mammoth Lakes, California, and was the only hospital within forty miles of the Mammoth community. Initially, Stehlik belonged to a group of physicians collectively known as the "Alpine Group" whose offices were located approximately one-half mile from Mammoth Hospital. The named defendants and alleged co-conspirators, known collectively as the "Mammoth Group," maintained their respective offices on the premises of the hospital itself. Plaintiff's Vol. I, p. 29.

Although the relationship between the "Alpine Group" and "Mammoth Group" is unclear, the working rapport Stehlik had with his fellow physicians is the subject of facts which are strenuously disputed. See

---

1. On April 12, 1985, the parties filed a stipulation and order re: Amendment Of Pleadings and to Clarify Identification of Party. Pursuant to said stipulation and order, the third amended complaint and all other previous pleadings were amended to the extent that the designation of defendant "Mammoth Hospital District, Inc." was changed to "Southern Mono Hospital District, dba Mammoth Hospital District, Inc.".

2. Two weeks prior to the scheduled oral argument on defendants' motions for summary judgment, the court was besieged with an "opposition" from plaintiff which contained approximately 1000 frequently unnumbered pages, comprised within four volumes. The opposition was written in narrative form with incomplete and/or missing citations and authority, various exhibits mismarked and unauthenticated, and a worthless index. While recognizing that a party may not prevail in opposition to a motion for summary judgment by simply overwhelming the district court with a "miscellany of unorganized documentation," Zoslaw v. MCA Distribution Corp., 693 F.2d 870, 883 (9th Cir.1982), the court has nonetheless gone through painstaking measures to insure that every proposition set forth by plaintiff has in some way, shape, or form been considered. Any error of the court in misstating or misconstruing a pertinent fact, argument or authority should fall upon plaintiff who had more than ample time to prepare an opposition and who has demonstrated no eagerness to comply with F.R.Civ.P. 56(e) much less to assist the court in its deliberations.

For the ease of the reader, plaintiff's complaint has been broken down into two main parts, to wit, "Civil Rights Violations" and "Antitrust Violations." The breakdown of plaintiff's allegations are not meant to be exhaustive or exclusive—only to be used as a mechanism to assist in the court's analysis.

Deposition of Dr. Thomas Merry, p. 60 ("very easygoing and easy to work with"); Deposition of Dr. George Kibler, p. 71 (considered Stehlik to have a fine reputation); *contra* Dr. Craig Paulson, letter of June 6, 1982 (Stehlik accused of severely breaching good interprofessional conduct and physically threatening Dr. Paulson, his wife, and unborn child); Dr. James Vawter, letter of June 9, 1982 (Stehlik verbally threatened Vawter and told him "he was going to make life miserable for [Vawter] in Mammoth.")

In the spring of 1982, Stehlik apparently became concerned over the quality of medical care at Mammoth Hospital. In particular, Stehlik criticized the performance of Drs. Tierney, Vawter, and Lovell. *See* Depositions of Dr. Lovell, February 22, 1985, p. 39–40 (Dr. Tierney had "mismanaged" births), May 17, 1985, p. 80 (rate of caesarean sections, abnormally high); Plaintiff's Vol. I, p. 24 (Drs. Tierney, Vawter, and Lovell did not finish their residencies in their respective fields of concentration); Report to the California State Board of Medical Quality Assurance by Dr. Paul Hildebrand, March 20, 1983 ("a great deal of moderate to high risk obstetrics is done including c-sections on primips [sic] by Dr. Vawter who ... has had no significant obstetrical training" ... "Forcep deliveries are performed by Dr. Tierney who has had very little training in obstetrics ..."); Letter of Barbara W. Phillips, Plaintiff's Vol. IV A, p. 19–20, (detailing an attempted therapeutic abortion performed by Drs. Tierney and Vawter in November 1980 on a patient who returned in January 1981, still pregnant, and who had a second abortion performed on a 15 to 18 week old fetus). On or about May 20, 1982, Stehlik contacted Mammoth Hospital Board Chairman, "Chip" Van Nattan and requested permission to make the Board aware of his belief as to the lack of proper medical care at Mammoth Hospital. *See* Declaration of Renee Wright, September 8, 1985, at 6; Plaintiff's Vol. I, p. 36; Letter of Dr. Steiger to Dr. Hildebrand, dated May 21, 1982, Plaintiff's Vol. III, p. 73.

On May 22, 1982, Dr. David Matthews, a member of the "Mammoth Group" and Dr. Stehlik engaged in a fist fight behind closed doors in the radiology suite at Mammoth Hospital. While there were no eyewitnesses to the altercation, each combatant claimed that the other had started the fight. On May 24, 1982, an emergency meeting was held by the medical staff at Mammoth Hospital. Dr. Stehlik attempted to attend the meeting with his attorney but was advised by hospital counsel that his attorney could not be present. Stehlik declined to partake of the meeting. *See* Bylaws of the Medical Staff of Mammoth Hospital (hereinafter Bylaws), X, 2(b). Dr. Matthews, however, attended the meeting, gave his version of the altercation, and recommended a one-year probationary period for Dr. Stehlik during which period no harassment, abuse, or verbal threats could be made.

The majority of the medical staff concurred with Matthews' recommendation, but agreed to continue the meeting to June 14, 1982, to allow Dr. Stehlik an opportunity to attend. Board Minutes of Lois Melton, May 22, 1982. Although granting a continuance, the minutes of the meeting reflect that the following terms of probation were unanimously approved for Dr. Stehlik:

1. No threats verbal or physical or any harassment of the Medical Staff be made by Dr. Stehlik for a period of one year following May 24, 1982.

2. No discussion of the issues or events occurring on May 22, 1982 be carried out with any person other than the individual's legal counsel.

By letter dated May 26, 1982, Otis Clasby, administrator of Mammoth Hospital informed Dr. Stehlik he had a "right to a hearing." On May 28, 1982, this advice was retracted by hospital counsel Michael A. Ross who advised Stehlik that no right to a hearing existed because Stehlik's hospital privileges had not been affected. (Bylaws, VII 1(d), state that a probationary recommendation is not considered to be an

"adverse" recommendation warranting an appeal.)

Local newspapers carried the story of the Matthews-Stehlik scuffle indicating that it had been an apparent "mutual combat" situation. The newspapers went on to state, however, that only Dr. Stehlik was placed on a one-year probationary term. *Mono Herald*, May 27, 1982, p. 1; *Mono Review*, May 27, 1982, p. 1.

On June 14 and 15, 1982, additional meetings of the medical staff were conducted at which time counsel for Stehlik attempted to participate and tape record the meeting. These actions were prohibited by the majority of the medical staff and counsel left the meeting. Thereafter Stehlik and Matthews told their respective versions of how the fight began and presented witnesses and letters on each of their behalves. The medical staff decided that since there were no independent eyewitnesses to the altercation,[3] no adverse action could be taken against either party. Both doctors were rebuked and instructed to write letters of apology to the Board. However, because the staff had received five letters from Drs. Tierney, Vawter, Matthews, Lovell, and Paulson of the "Mammoth Group," requesting corrective action against Dr. Stehlik, Stehlik was placed on probation subject to the following terms:

1. Probation effective May 24, 1982.

2. Probation duration of one year.

3. No further threats or harassment will be tolerated toward other members of the staff.

4. All record of the probation and letters of corrective action will be removed from his file upon successful completion of the probationary period, or if for any reason, Dr. Stehlik voluntarily terminates his staff membership.

Minutes of Floyd Parks, M.D., June 16, 1982.

**2. *The Antitrust Violations***

On July 1, 1982, the Hospital District contracted with Dr. Lovell to provide exclusive anesthesiologist services to Mammoth Hospital. Dr. Lovell was chosen over a group of five rotating board-certified anesthesiologists apparently on the basis that the hospital could not afford the services of the group. Deposition of Lois Melton, June 24, 1985, p. 12. Dr. Lovell's credentials are disputed. Deposition of Dr. Lovell, February 22, 1985, p. 102–07 (not a board-certified anesthesiologist, yet with experience gathered over time came to the same level of competence as a boarded anesthesiologist). In the fall of 1982, Dr. Lovell told Stehlik and the medical staff at Mammoth Hospital that he would not work with Dr. Stehlik and therefore not provide him anesthesiological services. Deposition of Dr. Lovell, February 22, 1985, p. 194; *See also*, letter dated January 23, 1983 from Lovell to Tierney, requesting that the medical staff terminate Stehlik's probation "and expel him from its ranks."

On July 1, 1982, Dr. Vawter entered into an exclusive contract with the Hospital District to provide 24-hour coverage in the emergency room of Mammoth Hospital. Vawter agreed to direct, organize, and administer a group of physicians and surgeons who would guarantee that not less than one member of the group be readily available in the emergency room, 24 hours per day, every day of the year with no exceptions. Prospective group members included: Drs. Vawter, Tierney, Cary, and Lovell of the "Mammoth Group," and Drs. Merry and Hildebrand of the "Alpine Group." While Vawter offered Hildebrand a position in the emergency room, he chose not to offer the co-physician, Dr. Merry, a contract presumably based on two medical cases in which Dr. Merry participated. On March 30, 1983, Dr. Hildebrand rejected Vawter's offer emphasizing the unfairness to Merry and the community "to arbitrarily exclude him without some sound basis and

---

**3.** At the present time, there are no witnesses to the altercation, independent or otherwise. In September, 1982, Dr. Matthews was killed in a single aircraft collision. On July 9, 1983, Dr. Stehlik committed suicide.

peer review or supervised practice." Letter of March 30, 1983, from Hildebrand to Vawter.

In November 1982, Dr. Cole, an orthopedic surgeon arrived in Mammoth Lakes and joined the "Mammoth Group." Prior to that time, Dr. Stehlik was the only orthopedic surgeon in the Mammoth area. On March 16, 1983, the Hospital District entered into a "Preferred Provider Contract" with Mammoth Mountain Ski Area which provided, *inter alia,* the following: (1) that Mammoth Hospital would be the exclusive provider of emergency or other medical services for the Ski Area; (2) an option to extend the agreement for an additional successive term not to exceed forty years; (3) the Hospital would agree to provide free transportation, via an ambulance van, of patients from emergency rooms at the Ski Area to Mammoth Hospital; (4) the van would not stop at the Alpine Clinic, but would come directly to Mammoth Hospital; (5) in exchange, the employees at the Ski Area would be guaranteed free medical services at Mammoth Hospital as a fringe benefit of their employment. The owner of the Ski Area, Dave McCoy, who signed the exclusive contract, was a member of the Hospital Board. Deposition of James Vawter, M.D., January 28, 1985, p. 116–18. *See also* Deposition of Paul Hildebrand, M.D., February 19, 1985, p. 83 (Alpine Clinic business cut 80 to 90% due to Preferred Provider Contract and ambulance service.)

On April 1, 1983, Dr. Stehlik received a letter from the American Board of Orthopedic Surgery, Inc., indicating he was declared ineligible to take the 1983 board examination. The letter advised that "this action was based on information received that you are currently on probation at Mammoth Hospital and because of ques-

tionable references received." In this regard, the deposition testimony of Margaret Cary, M.D., February 21, 1985, pp. 89–90, 127–28, indicated that Dr. Tierney of the "Mammoth Group" had written letters to the Board to keep Stehlik from being board certified.

Based on the foregoing, plaintiff, RENEE WRIGHT, administratrix of the estate of Dr. Stehlik,[4] instituted the present proceedings alleging the following seven causes of action against the defendants: (1) deprivation of civil rights under 42 U.S.C. § 1983[5], namely the right of freedom of expression, the right to freedom from illegal seizure of the person, the right to be free from interference with liberty without due process of law, the right to be free from deprivation of property without due process of law, the right to counsel, the right to equal protection of the laws, the right to freedom from invasion of privileges and immunities, the right to privacy, the right to be free from cruel and unusual punishment, and the right to be free from deprivation of life without due process of law; (2) violation of the Sherman Act, 15 U.S.C. § 1[6]; (3) common law conspiracy; (4) false imprisonment; (5) battery; (6) defamation; and (7) interference with prospective business interests. In relief, plaintiff seeks damages of $10 million for deprivation of civil rights, $10 million trebled for the anti-trust claim, $1 million each for the battery and false imprisonment claims, punitive damages of $6 million against all defendants on the federal claims and against only the individual defendants on the pendent claims, $10 million for lost earnings, medical and incidental expenses and compensatory damages according to

---

**4.** On December 8, 1983, the court issued an order which granted plaintiff's motion for substitution of Renee Wright as special administratrix of the estate of Jan Jaroslav Stehlik.

**5.** On October 23, 1984, this court filed an order granting with prejudice defendants' motions to dismiss all claims under 42 U.S.C. § 1985(3) for failure of plaintiff to plead class-based animus. Since a cause of action under § 1986 is dependent upon a valid claim under § 1985, this court

will *sua sponte* dismiss plaintiff's § 1986 claim with prejudice. *Kaylor v. Fields,* 661 F.2d 1177, 1184 (8th Cir.1981).

**6.** *See* Plaintiff's Vol. I, p. 14, wherein the plaintiff requests that in order to remove redundancy from the second cause of action, the court strike all references except to section one of the Sherman Act.

proof, and reasonable attorney's fees and costs.

DISCUSSION

1. *Civil Rights Claims*

As a general rule, a party seeking summary judgment under F.R.Civ.P. 56, must demonstrate that there are no genuine material issues of fact in dispute and that said party is entitled to judgment as a matter of law. *Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir.1984). The burden of demonstrating the absence of an issue of material fact lies with the moving party. *Zoslow v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). When the moving party proffers competent evidence tending to prove its version of the facts, the opposing party must produce competent evidence tending to prove the contrary; in short, an opposing party cannot resist a motion for summary judgment relying on the mere allegations or denials contained within the pleadings. *Scoggins v. Boeing Co.*, 742 F.2d 1225, 1230 (9th Cir.1984).

a. *State Action*

Defendants first argue that plaintiff's civil rights claims under 42 U.S.C. § 1983 cannot be maintained because plaintiff can neither establish the jurisdictional prerequisite of "state action" nor that any "right," "privilege," or "immunity" had been denied to the decedent, Dr. Stehlik.

Section 1983, Title 42 U.S.C. provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

By its terms, the plaintiff must establish that some person denied decedent a federal constitutional right and that that same person acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Section 1983, which was enacted pursuant to the authority of Congress to enforce the fourteenth amendment, prohibits interference with federal rights under color of state law. *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982). In *United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966), the Supreme Court stated:

In cases under § 1983, "under color" of law has consistently been treated as the same thing as the "state action" required under the Fourteenth Amendment.

*See Halet v. Wend Investment Co.*, 672 F.2d 1305, 1309 (9th Cir.1982). However what constitutes sufficient state participation to attribute activity to the state under § 1983 has proven to be an extremely difficult question. *Krynicky v. University of Pittsburgh*, 742 F.2d 94, 97 (3d Cir.1984). To date, the Supreme Court has not developed a uniform test for determining when state action exists and has stated no such unitary test is possible. *Reitman v. Mulkey*, 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967). The ultimate question has been whether the alleged infringement of federal rights is "fairly attributable to the State?" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982).

In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held "that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 2037. Instead liability could be imposed for injuries inflicted pursuant to a "government policy and custom." *Id.* More recently, the Supreme Court has stated "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

Defendants factually argue that the placement of Dr. Stehlik on probation "was

done by the medical staff, a self-governing separate legal entity from the Hospital District." Defendants' Point & Authorities, at 26. Moreover, defendants maintain that pursuant to Bylaws, VII, 1(d) and (e), a probationary recommendation which does not affect a physician's clinical privileges can properly and exclusively be made by the medical staff and does not require final authority of the Hospital District. Therefore, defendants contend, the complained of conduct was done by private individuals without regulation and/or control by a state entity.

In opposition; plaintiff argues the color of state authority marked the acts of each and all the defendant/co-conspirators. Plaintiff's Vol. II, p. 83. Plaintiff contends that Stehlik wished to focus attention on the "Mammoth Group's" medical incompetence, *id.* at 42; that not only did defendants foreclose Stehlik's opportunity to speak on the issue of competence but conspired amongst and between themselves to drive Stehlik out of the Mammoth Lakes area, to his eventual suicide, while at the same time greatly impeding the financial success of the "Alpine Group." Plaintiff specifically points to Board Member Dave McCoy, who participated in the Preferred Provider Contract and approved the exclusive contracts for anesthesiology and emergency room care.

In the case at bar, defendants have wrongly characterized Stehlik's injuries as a mere one-year probationary period which limited Stehlik from fighting and harassing members of the medical staff. In truth, the claims of the plaintiff go far beyond this mere allegation and implicate a conspiracy between the individual defendants and Mammoth Hospital. It is ludicrous to argue, as defendants do, that the medical staff was a separate entity from the hospital district, as it is the hospital district which prescribes the duties and powers of the hospital employees and hospital administrators. Cal.Health & Safety Code § 32121(h). It is undisputed that the Mammoth Hospital is a public hospital organized and governed by "The Local Hospital District Law." Cal.Health & Safety Code § 32000, *et seq.* Furthermore,

> [t]here is no question that when those in charge of the affairs of a public hospital deal with staff members ... the dealings must conform to the requirements and prohibitions of the fourteenth amendment. And, if the authorities of a public hospital, acting under color of law, deprive a person of a federally protected right, he may seek redress under § 1983.

*Briscoe v. Bock,* 540 F.2d 392, 394–95 (8th Cir.1976). *See also, Kay v. North Lincoln Hospital District,* 555 F.Supp. 527, 529 (D.Or.1982) (hospital administrator's acts to discharge chief x-ray technician may fairly be said to represent official policy).

■ In summary, this court finds that defendants' actions were performed pursuant to state code provisions detailing the hiring and firing of hospital employees. Said actions amount to an "affirmative link" between the individually named defendants, the hospital district's policies and decisions and the constitutional deprivations claimed. Hence, this court finds that the jurisdictional requirement of "state action" pursuant to § 1983 has been satisfied and defendants' motion for summary judgment is therefore DENIED.

#### b. *Liberty and Property Interests*

Although plaintiff has enumerated ten different deprivations of purported civil rights, defendants' moving papers focus primarily on plaintiff's claims that liberty and property interests were infringed. Hence this court will first examine the liberty and property challenges and thereafter *briefly* address the other nine claims.

Defendants assert that the newspaper accounts of plaintiff's probation are insufficient to give rise to a liberty interest as they do not impute moral turpitude, but rather an inability to get along with others. Furthermore, defendants propound that the imposition of probation by the medical staff is insufficient to give rise to a property interest cognizable under the Constitution.

In *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir.1976), the court set forth a two-prong analysis by which to evaluate Dr. Stehlik's constitutional claim. First, this court must determine whether Stehlik's interest rises to the level of a "liberty" or "property" interest. Second, if such an interest is found, the court must then weigh the competing interests of the individual and the state to determine what process is constitutionally required. *Id.* at 365. *See also, Lew v. Kona Hospital*, 754 F.2d 1420, 1424 (9th Cir.1985).

In analyzing a plaintiff's claim of a deprivation of a liberty interest, the Supreme Court has recognized that a liberty interest is implicated where "a person's good name, reputation, honor or integrity is at stake." *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). Following this rationale, the Ninth Circuit has stated:

> In the context of *Roth*-type cases, a charge which infringes one's liberty can be characterized as an accusation or label given the individual by his employer which belittles his worth and dignity as an individual and, as a consequence is likely to have severe repercussions *outside* of professional life. Liberty is not infringed by a label of incompetence, the repercussions of which primarily affect professional life, and which may well force the individual down one or more notches in the professional hierarchy. The distinction is not perfect; our utility affects our dignity and worth whether viewed from within or without. However, implicit in such a distinction is the notion that the constitutional need for procedural protection is not strong when the charge (e.g., incompetence) involves a matter which is peculiarly within the scope of employer-employee relations and when the likely results of even a false charge are reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of gainful employment within the trade or profession.

(footnotes omitted) *Stretten*, 537 F.2d at 366.

In *Stretten*, the court of appeals held that plaintiff's termination of residency in pathology at a veterans hospital did not infringe any liberty interest. While terminated "for unsatisfactory performance," *id.* at 363, and "an unwillingness or inability to deal with his coworkers in a professional manner," *id.* at 366, the court ruled "[t]hese are not the kind of charges which are likely to preclude Dr. Stretten from practicing medicine." *Id.* Moreover, the charges did not preclude him from staying in his speciality, as he was offered a pathology residency in another hospital. *Id.* at 366 n. 14.

The Ninth Circuit, however, on other occasions has held that charges made against a part-time staff physician by a hospital rose to the level of "moral turpitude" and implicated a liberty interest. *Orloff v. Cleland*, 708 F.2d 372, 378 (9th Cir.1983). In *Orloff*, the physician was terminated for having allegedly been on duty at two hospitals at the same time and hence having received over $3,000.00 for services he did not render. The court of appeals reversed the summary judgment of the trial court, finding material issues of fact remained concerning whether the charges of wrongdoing were true and whether the hospital had publicized them. *Id. See also Kay v. North Lincoln Hospital Dist.*, 555 F.Supp. 527, 530 (D.Or.1982) ("publication of the notice of [the chief x-ray technician's] termination, coupled with the allegation that he had been guilty of a 'gross violation of proper conduct,' infringed Kay's liberty interest in employment as a stigmatizing change prior to an opportunity to refute the charge.")

Here, the media leak concerning Stehlik's one-year probation indicated that the vote had been "unanimous" and that "other alleged incidents involving Dr. Stehlik ... had gone unreported." Plaintiff's Vol. III, p. 105. While the press stated Stehlik's probation required him to "refrain from verbally or physically threatening other staff members ...," no mention was made of any punishment to the other combatant,

Dr. Matthews. *Id.* Hence, Dr. Stehlik by inference is portrayed as the troublemaker. According to plaintiff, these are precisely the type of charges that limited his practice of medicine in the ski community of Mammoth Lakes. This same charge of probation, moreover, was compounded by the fact that the charge delayed Dr. Stehlik's chances to take the board examination to become certified in orthopedic surgery, a necessary prerequisite at some hospitals. Clearly, the court is confronted not with mere economic loss but a "protracted interruption of gainful employment within the trade or profession." *Stretten,* 537 F.2d at 366.

Hence while defendants are correct in pointing to the isolated probation as merely inferring that Stehlik had difficulty getting along with others, this charge was later enlarged arguably to foreclose his opportunity to practice orthopediatry. Although the court perceives the issue as close, the court is of the opinion that the issue is one best left to the decision making processes of the trier of fact. For this reason, the court finds that the accusations against Stehlik, given by the defendants, not only "belittled his worth and dignity as an individual ...," but caused "severe repercussions *outside* of professional life." *Id.*

■ In summary, this court finds that defendants' actions raise genuine issues of material fact as to whether Stehlik's interest rises to the level of a constitutionally protected "liberty" interest.

As for plaintiff's claim of a deprivation of a property interest, the plaintiff is required to demonstrate an entitlement to a benefit. "Entitlements are created by 'rules or understandings' from independent sources, such as statutes, regulations, and ordinances, or express or implied contracts." *Orloff,* 708 F.2d at 377; *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). "An entitlement may spring from an understanding if the understanding is 'mutually explicit.'" *Board of Regents v. Roth,* 92 S.Ct. at 2709; *Orloff,* 708 F.2d at 377. In *Orloff,* the Ninth Circuit reversed an order of summa-

ry judgment finding material factual disputes remained concerning whether a "mutually explicit" understanding arose between Dr. Orloff and the veterans' hospital. Although Orloff's appointment had expired "there may have arisen an understanding of continued employment based on prior treatment of Orloff or other VA employees sufficient to constitute a *de facto* property interest under *Perry v. Sindermann." Orloff,* 708 F.2d at 377. This decision was premised on the fact that the hospital did not implement its termination decision until four months after Orloff's appointment had terminated or that it had indefinitely extended his appointment. *Id.* See *Stretten, supra* (resident physician who was advised at time of appointment that he would be employed for four years "unless sooner terminated, and subject to periodic review by resident review board," was deemed to have a property interest in his residency.)

Plaintiff's primary claims may be summarized as follows: that Stehlik had a property interest in the good will and reputation of his medical practice; Plaintiff's Vol. II, p. 36; that the press releases indicated Stehlik and Matthews had gotten into a fist fight and that Stehlik alone was put on probation; that this information arguably affected his ability to attract patients and treat them at Mammoth Hospital; that the denial of Stehlik's chance to take the orthopedic boards, based on letters from the defendants, further exasperated Stehlik's chances to practice his medical specialty; that the exclusive contracts entered into by defendants which cut Stehlik off from the emergency room and anesthesiological services and the van ambulance which directed patients away from the "Alpine Group" all but eliminated his livelihood in surgery.

Hence, while defendants argue they merely placed Stehlik on a behavioral probation, which did not expressly limit his ability to practice orthopedics, this court finds genuine issues of material facts are raised concerning a *de facto* denial of his property interest. *See, e.g., Wyatt v. Ta-*

*hoe Forest Hospital Dist.,* 174 Cal.App.2d 709, 715, 345 P.2d 93 (1959) ("it is common knowledge that a physician or surgeon who is not permitted to practice his profession in a hospital is as a practical matter denied the right to fully practice his profession [as m]uch of what a physician or surgeon must do can only be performed in a hospital.") *See also Ezekial v. Winkley,* 20 Cal.3d 267, 273, 142 Cal.Rptr. 418, 572 P.2d 32 (1977) ("A hospital's staff membership decisions contain [the] potential for arbitrary impairment of the physician's right to engage in activities authorized by his license.") Accordingly, this court finds defendants' acts raise genuine issues of material fact as to whether Stehlik's interest in his medical practice rises to the level of a constitutionally protected "property" interest.

Having ascertained the establishment of a liberty and property interest, this court is called upon to balance the "process which is due" to protect said interests. The Supreme Court has held such a determination:

> generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Due process is regarded as a flexible concept and its procedural requirements vary upon the particular deprivation. In *Stretten,* the court of appeals found that while the resident physician had a property interest in his residency, he was not entitled to a full adversary hearing either before or after his termination. 537 F.2d at 369. In *Stretten,* the plaintiff was afforded not only a hearing before a three-member Review Board, but the opportunity to confront adverse witnesses and to have an attorney present. Moreover, three months prior to his termi-

nation, Stretten was advised that his termination would be sought and provided with the reasons why his superiors felt he should be terminated. Therefore, Stretten received the essentials of minimum due process.

Such was not the case in regard to the plaintiff in *Orloff.* While assuming *arguendo* that a post-termination hearing would suffice, the Ninth Circuit held

> there remain factual disputes concerning whether the VA accorded Orloff any hearing at all. We note the initial notice of termination stated specifically that he had no appeal within the VA. It is unclear, even after the VA extended the termination date, whether the VA actually reviewed the merits of the termination decision or merely assured itself that its own procedural requirements, if any, had been followed. There is no indication in the record that Orloff was invited to submit evidence, even in the form of affidavits, on his behalf or to examine the evidence against himself. [citation omitted] Moreover, although due process does not always require a full adversary hearing [citation omitted] it is unclear without first determining the nature of Orloff's property or liberty interest whether such a hearing would be warranted in these circumstances, or to what extent various procedural safeguards, e.g., the right to confront and cross-examine witnesses, should be sacrificed.

708 F.2d at 379. Similarly in *Kay, supra,* the district court concluded the chief x-ray technician was not given minimal due process.

> Kay was summoned before his superior with no notice of the charges against him. He was told to write out his version of the events, but was not allowed to confront the evidence upon which his superiors relied. The next day he was fired and the notice was posted.

555 F.Supp. at 532.

In balancing the *Mathews v. Eldridge* factors in the context of Dr. Stehlik's situa-

tion at Mammoth Hospital, this court must review the extent and timing of the procedures, if any, afforded Dr. Stehlik in protecting his liberty and property interest as an orthopedic surgeon at Mammoth Lakes. Obviously, the private interest affected by the defendants' official actions goes to the very core of Dr. Stehlik's chosen field of medicine—his reputation and ability to practice orthopedic surgery. Plaintiff contends and the record supports the fact that defendants' acts to place Stehlik on probation and recommend that he not be able to take the orthopedic board examination severely impeded his medical practice.

On the other side of the coin is the intent of the hospital itself. As stated in *Stretten,* not only does a hospital have "a special interest in protecting its patients from treatment by one who is professionally incompetent," but a

> hospital staff is highly interdependent, both in the sense that one doctor depends upon the professional skill of other doctors and in the sense that the collegial nature of the body makes tolerable working relationships an absolute prerequisite to effective staff performance. The necessity for a healthy working relationship is a function of the nature of the work to be done. Incompatible workers on farms, ranches, or in certain types of factories can function reasonably well although even there it is doubtful that full efficiency is achieved. Effective performance by physicians on the staff of a hospital, whose tasks require a high degree of cooperation, concentration, creativity, and the constant exercise of professional judgment, requires a greater degree of compatibility. The Hospital must recognize this necessity. This enhances its interest in quickly dealing with incompetence and debilitating personal frictions.

537 F.2d at 368. *See, e.g., Jefferson Parish Hospital Dist. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984) ("the hospital [h]as unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges.")

In the instant case, there are no charges before the court that Dr. Stehlik's competence to perform surgery was anything but good. Rather the official charges against him were more in the nature of his inability to get along with fellow medical staff members. However, this court perceives the one-year probation for harassment and fighting to have implicitly, if not explicitly, raised concerns over Stehlik's proficiency in the operating room. This view is supported by the fact that the American Board of Orthopedic Surgery declared him ineligible to take the 1983 board examination and other doctors refused to work with him.

Finally, this court is required to weigh the risk of erroneous deprivation of interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. Defendants assert that assuming arguendo liberty or property interests were infringed, due process safeguards were observed. Defendants point to the fact Stehlik was requested to attend the May 24, 1982 medical staff meeting, which resulted in probation, but declined to attend. At the second meeting, defendants maintain plaintiff was permitted to hear the charges against him, examine witnesses, and submit his own evidence and witnesses. Defendants' Points and Authorities, at 43. These factors, argue defendants, amount to minimal due process.

The two sets of minutes from the May 24, 1982 meeting shed light on the issue but nonetheless cause this court some concern. The minutes of Hospital Board member, Lois Melton indicate that Stehlik was advised *not* to attend the meeting.

> Prior to the start of the meeting, Bill Lampi, attorney for Dr. Stehlik stated that he had been talking to Mike Ross, hospital attorney, and Mr. Ross had advised him to advise his client not to attend the meeting.

Dr. Floyd Parks' minutes, however, state:

> Prior to the commencement of the meeting Jan Stehlik, M.D., came and was present with his attorney. A short dis-

cussion was held during this time the attorney and Dr. Stehlik read Dr. Matthew's [sic] letter requesting a corrective action. They then left the meeting stating that Dr. Stehlik would not be present.

. . . . .

Dr. Stehlik was telephoned by Wade Eckert in an attempt to have him present his side of the story. However, Dr. Stehlik felt he would not be able to come without contacting his lawyer and declined to come to the meeting. . . .

In reviewing the minutes of Lois Melton, there is mention that "Dr. Matthews recommended a probationary period of one year for Jan. . . . The *majority* felt this was a fair solution and voted to continue the meeting on June 14, 1982 allowing time for Dr. Stehlik to attend." (emphasis added). A fair reading of these minutes would allow one to assume that *no* action was then taken on May 24, 1982, but that probation would be seriously considered on the subsequent meeting of June 14, 1982.

In reviewing the minutes of Dr. Floyd Parks, however, a striking inconsistency becomes apparent. The Parks' minutes state, "It was *unanimously* approved that probation be utilized as the action by the Medical Staff as well as a second Staff meeting to be held June 14, 1982." (emphasis added). In short, the Parks' minutes demonstrate that indeed a term of probation had been decided upon and in fact imposed, and that the staff "unanimously decided that the statement of the terms of probation be placed in Dr. Stehlik's staff file."

■ The above mentioned inconsistencies in this court's opinion raise genuine issues of material fact as to whether Stehlik was dissuaded from attending and defending his actions at the staff meeting in which he was placed on probation.

In regard to the meeting of June 14, 1982, there are again inconsistencies which may be gleaned from the minutes of the medical staff meeting. Melton's minutes indicate Stehlik was given the right to present his side of the story, with witnesses and testimony. Parks' minutes make no mention of this, albeit state that the "Medical Staff feels that because the events of May 22 were not witnessed, that no specific blame can be placed with certainty. Therefore, no *adverse* action can be taken against either party." (emphasis original). Parks' minutes, however, state

> [t]he Medical Staff received five letters requesting corrective action against Dr. Stehlik for harassment and threatening behavior against certain members of the staff. These letters and supporting testimony were considered grounds for [one year probation].[7]

A review of the medical staff minutes not only raises material issues as to the timing and basis of the imposition of probation, but implicates a possible "set-up" to deprive Dr. Stehlik of his chance to confront his accusers and present evidence. While Parks' minutes indicate no blame could be placed on either Stehlik or Matthews "with certainty," it is Dr. Stehlik who is placed on probation, arguably for the fighting incident. As a side note, this court recognizes that *no* procedural safeguards were provided Dr. Stehlik in regard to the recommendation by defendants that he not be afforded the chance to take the orthopedic board examination.

The court finds on the evidence adduced in support of and in opposition to the motion for summary judgment that the procedures utilized by the defendants do not appear to have satisfied minimal procedural due process requirements insofar as plaintiff's property and liberty interests were concerned. While this court recognizes the importance of harmonious hospital staffs,

---

7. The letters, as indicated *supra* ironically enough came from the other combatant (Matthews) and four medical staff members (Tierney, Vawter, Lovell, and Paulson), who in turn were the same persons who voted for the imposition of a probationary term. From these con-flicting minutes, the court again finds the following genuine issues of material fact, to wit: whether Stehlik was placed on probation for the May 22, 1982 incident or for receiving five corrective action letters from the same medical staff that voted for his probation?

the court believes the risk of deprivation to Dr. Stehlik's interests were potentially higher and that additional and substitute procedural safeguards could have easily been afforded with minimal fiscal and administrative burden. For these reasons, defendants' motion for summary judgment on plaintiff's § 1983 cause of action in regard to the deprivation of procedural due process afforded Dr. Stehlik's liberty and property interests is DENIED.

### c. *Freedom of Expression*

Plaintiff's claims for deprivation of first amendment freedom are based principally on the contention that Dr. Stehlik wished to "blow the whistle" on the incompetence of the "Mammoth Group," but was foreclosed from doing so by the imposition of a probationary term and a condition of probation that he not discuss the matter with anyone but legal counsel. In essence, plaintiff believes that the term of probation was a "gag order" of sorts that divested him from "disclos[ing] the truth or his version to the public, to his associates, to the nurses, or to his patients." Plaintiff's Vol. II, at 46.

In response, defendants' papers are devoid of any contrary evidence to plaintiff's claims and do not set forth any rationale why Stehlik was not to discuss his probation with anyone but legal counsel. At oral argument, defendants maintained that this condition of probation was appropriate in light of the Hospital District's duty to serve the public and privately deal with hospital matters.

In *United States v. O'Brien,* the Supreme Court held that government regulation affecting speech is justified only if "(1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of the speech; and (4) the incidental restriction on first amendment freedom is no greater than essential to further that intent." *Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 535 (9th Cir.1984), *citing United States v. O'Brien,*

391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

■ After considering the parties arguments the court finds a genuine issue of material fact is raised as to the constitutionality of the probation limitation. The court perceives a conflict between the limitation placed on decedent to defend his actions, refute the charges of Dr. Matthews and other staff members, and convince the community of Mammoth Lakes of his proficiency in medicine as against the ability of Mammoth Hospital to deal with staff members. The court cannot determine as a matter of law the importance of the government's interest, its relationship to the suppression of decedent's speech, and whether the restriction is incidental or fundamental to first amendment freedom. Accordingly, defendants' motion for summary judgment as to plaintiff's claims under § 1983 for infringement of first amendment rights is DENIED.

### d. *The Other Alleged Deprivations*

While substance has been found in plaintiff's alleged deprivations of liberty and property without procedural due process, and limitation of plaintiff's freedom of expression, the panoply of other alleged deprivations of constitutional rights are less worthy.

### 1. *Illegal Seizure*

■ Plaintiff claims that Dr. Stehlik's fourth amendment right to be free from illegal seizure without a warrant was infringed by reason of the battery committed by Dr. Matthews on Dr. Stehlik in the radiology suite on May 22, 1982. In this regard, the court notes that 42 U.S.C. § 1983 protects only violations of rights protected by the Constitution, "not violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law privileges." *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979).

Here, the court finds the record devoid of any evidence that would support the proposition that a fight between Drs. Stehlik and Matthews was orchestrated by and as a result of some sort of a conspiracy amongst and between the defendants. Rather, all evidence points to the conclusion that the fight was nothing more than an isolated feud between two physicians. Moreover, the fact Dr. Matthews fought with Dr. Stehlik simply does not rise to the level of a deprivation of a constitutional right. At most, plaintiff's allegation arises out of a state tort law claim. Accordingly, plaintiff's fourth amendment claim under § 1983 is not legally cognizable and the court will grant defendants' motion for summary judgment on said claim.

### 2. *Right to Counsel*

██ Plaintiff's claim that he had a right to counsel, while recognizing said right is not absolute, is based on the allegation that the treatment that Dr. Stehlik was subject to was "indistinguishable in fact from formal punishment." Plaintiff's Vol. II, at 72. Plaintiff relies on *Ney v. California*, 439 F.2d 1285 (9th Cir.1971) in support of this claim. In *Ney*, the United States Court of Appeals for the Ninth Circuit reversed in part the district court and held that a state prisoner had properly alleged an infringement of the constitutional right to counsel under 42 U.S.C. § 1983 based on the Supreme Court decision of *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). *Ney*, 439 F.2d at 1287–88. Factually, plaintiff maintains he was denied the constitutional right to counsel at the May 24 and June 14 and 15, 1982 staff meetings.

The Bylaws provide:

The hearings provided for in these Bylaws are for the purpose of intraprofessional resolution of matters bearing on conduct or professional competency. Accordingly, neither the Practitioner, the Hearing Committee, nor the Governing Body shall be represented in any phase of the hearing or appeals procedure by an attorney at law.

Bylaws, X, 2(b). Here, Dr. Stehlik was neither a criminal defendant nor subjected to criminal-like proceedings. Rather, this court views the Bylaw prohibition of counsel representation to be rationally based on the hospital's need to gather facts, to regulate a highly interdependent staff, and to expedite discretionary matters. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 583, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) (high school students suspended from school up to 10 days for misconduct afforded only notice and hearing, and not the opportunity to secure the representation of counsel); *Downing v. LeBritton*, 550 F.2d 689, 692 (1st Cir.1977) (mentally retarded discharged university employee not entitled to retain legal counsel for termination proceedings because university had broad discretion to administer its internal affairs, it would stimulate lawyer representation of the University and others, it would formalize the hearings and force them into an adversary mold, it would case a litigation chill on decisions to terminate, and increase the likelihood that many otherwise ordinary personnel actions would become "causes celebres.")

Accordingly, this court will grant defendants' motion for summary judgment on plaintiff's claim under § 1983 of the denial of the right to counsel.

### 3. *Right to Travel*

Plaintiff's claim to a "right to freedom from invasion of privileges and immunities" is, in summary, an allegation that Mammoth Hospital imposed a residency requirement on its doctors such that the constitutional right to travel was infringed. In this regard, the Bylaws state:

The Active Medical Staff shall consist of physicians practicing full time within the community who regularly admit to/or consult patients in the Hospital, who are located close enough to the Hospital to provide continuous care to their patients . . .

Bylaws, IV, 2.[8]

█ In *McCarthy v. Philadelphia Civil Services Commission*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that a Philadelphia ordinance which required employees of the city to be residents of the city during the time that they were employed did not violate the constitutionally protected right of interstate travel. Similarly, this court finds the Mammoth Hospital's requirement that its staff be "located close enough to the Hospital to provide continuous care to their patients" is a valid, appropriately defined, and uniformly applied bona fide residence requirement. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 255, 94 S.Ct. 1076, 1081, 39 L.Ed.2d 306 (1974). Therefore, defendants' motion for summary judgment on plaintiff's claim of infringement on the constitutional right to interstate travel under § 1983 is herein GRANTED.

### 4. *Deprivation of Life*

Plaintiff next claims that Dr. Stehlik's suicide was "caused" by defendants' acts and hence is a constitutional tort compensable under § 1983. In *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), the Supreme Court addressed a similar challenge. In *Martinez*, a lawsuit was brought under 42 U.S.C. § 1983 for the murder of a 15–year old girl by a parolee who had been released from custody five months before the killing. Plaintiffs claimed that the state officials by the action of releasing the parolee, subjected the decedent to a deprivation of life without due process of law.

The Supreme Court affirmed the ruling of the lower courts in finding that the plaintiffs had not alleged a claim for relief under federal law. The Court emphasized that the fourteenth amendment protected the girl "only from deprivation by the 'State ... of life ... without due process of law.'" *Id.* at 284, 100 S.Ct. at 559.

> Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action.... But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. Although a § 1983 claim has been described as a "species of tort liability," *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128, it is perfectly clear that not every injury in which a state official has played some part is actionable under the statute.

*Id.* at 284–85, 100 S.Ct. at 559.

In opposition to defendants' motion for summary judgment, plaintiff submits the Declaration of Walter Bromberg, M.D. Said declaration states that "all suicides have multiple causations" and that Dr. Stehlik's suicide was caused by

> (1) the harassment, malicious treatment, loss of practice, embarrassing physical assault upon him, loss of self-esteem, plus (2) his physical injury which involved a concussion of the brain, plus (3) his marked depression over several years and his inability to maintain his self esteem. Another cause could also be his feeling of helplessness in terms of the loss of esteem with the dependence he perceived to be necessary from his father and mother; finally a moderate degree of marital disharmony not uncommon

---

**8.** *See also* a letter dated May 30, 1983 from Dr. Tierney to Stehlik which, according to plaintiff, amounts to an unlawful residency requirement. The letter is set forth herein:

Dear Dr. Stehlik,

This letter is in request of information regarding your present status on Mammoth Hospital's active staff. According to our by-laws, you must practice full time in Mammoth Lakes to be eligible for active staff privileges.

Whereas you have expressed your intention to resign from Mammoth Hospital Staff due to practice relocation, you will no longer be eligible for active staff privileges at that time. I have received several communications that have indicated this situation to be true at the present time.

Please notify me by letter within 10 days to formally document your present practice situation....

among young physicians and professionals in their early periods of training. Plaintiff's Vol. IV A.

■ Reviewing the evidence in a light most favorable to the plaintiff, the court is nonetheless persuaded that the evidence is insufficient to raise a genuine issue of material fact on plaintiff's claim of deprivation of life without due process of law. The fact that Dr. Stehlik used a gun to take his own life at the home of his parents on July 9, 1983 (approximately 14 months post the Matthews-Stehlik altercation) is too remote an incident to be linked with defendants' alleged actions. While arguably a contributing factor in the mind of Dr. Stehlik, plaintiff has simply offered too little evidence to outline a systematic effort by defendants to proximately cause Dr. Stehlik's death. *Contra Hirst v. Gertzen,* 676 F.2d 1252 (9th Cir.1982) (civil rights plaintiffs' offer of proof, which outlined systematic failure on part of relevant county officials to exercise even minimal care in hiring and supervision of alleged violent deputy in charge of prisoners at county jail, sufficiently alleged triable issue that defendants' conduct in hiring and supervising their deputies was negligent and created foreseeable risk that violation of prisoner's civil rights would occur and in fact proximately cause his death).

Based on the foregoing, the court will grant defendants' motion for summary judgment on plaintiff's claim of deprivation of life without due process of law.

### 5. *Cruel and Unusual Punishment*

■ Plaintiff's claim that Dr. Stehlik suffered "cruel and unusual punishment" on account of defendants' actions is without merit. In *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 1409, 51 L.Ed.2d 711 (1977), the Supreme Court reaffirmed the principle that the proscription against the eighth amendment's cruel and unusual punishment was designed to protect those *convicted* of crimes. Here, the eighth amendment does not apply to Dr. Stehlik, as he was not convicted of a crime. Accordingly, the court grants defendants'

motion for summary judgment on plaintiff's civil rights claim under the eighth amendment.

### 6. *Equal Protection*

Plaintiff's § 1983 cause of action under the fourteenth amendment's equal protection clause is that defendants invidiously discriminated against Dr. Stehlik and unlawfully denied him staff privileges at Mammoth Hospital. More specifically, the plaintiff argues there was a discriminatory treatment applied to the "Alpine Group" to which Stehlik belonged, as compared to the "Mammoth Group," to which the defendants principally belonged.

The proper standard for review of an equal protection claim is the rational basis test. *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Strict scrutiny is the proper test of a legislative classification only when the classification impermissibly interfers with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. *Id. Brandwein v. California Bd. of Osteopathic Examiners,* 708 F.2d 1466, 1470 (9th Cir.1983). In the present case, plaintiff's claim does not involve either of the latter circumstances.

In general, courts have been especially deferential to legislative classifications in cases of challenges to the state regulation of licensed professions. *See, e.g., Ohralik v. State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 1920-21, 56 L.Ed.2d 444 (1978) ("the state bears a special responsibility for maintaining standards among members of the licensed professions."); *Brandwein,* 708 F.2d at 1470.

In applying the rational relations test, the Court has also stressed the heavy procedural burden placed upon the plaintiff in proving his case. The plaintiff in a challenge to a legislative classification, reviewed under this standard, must prove that the facts on which the legislature may have relied in shaping the classification "could not reasonably be conceived to be true by the governmental

decisionmaker." *Vance v. Bradley*, 440 U.S. [93] at 111, 99 S.Ct. [939] at 949 [59 L.Ed.2d 171]. "The admission that facts are arguable" is enough to justify the legislative judgment. *Id.* at 112, 99 S.Ct. at 950. And in reviewing the rationality of the classification, a court may hypothesize legislative purposes: "where there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,' *Flemming v. Nestor*, 363 U.S. [603], at 612, [80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435], because the Court has never insisted that a legislative body articulate its reasons for enacting a statute." *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

*Id.* at 1470–71.

▪ Defendants herein submit that the imposition of probation as well as the awarding of exclusive contracts "could conceivably be said to further the state's interest in improving the quality of health care rendered to its citizens." Defendants' Points and Authorities, at 49. In this court's view, the different treatment of the "Alpine Group" as opposed to that of the "Mammoth Group" is rationally based and serves a conceivable, legitimate governmental purpose, i.e., the regulation of a county hospital. The decision to place the decedent on probation is well within the powers of the hospital to promote staff harmony. Similarly, the exclusive contracts signed by defendants are rationally related to their power to provide services to and for the hospital. Hence, this court finds these asserted legitimate government purposes sufficient to justify the distinctions made by the defendants. Accordingly, defendants' motion for summary judgment on plaintiff's claim of equal protection under § 1983 is GRANTED.

7. *Right to Privacy*

▪ The last of plaintiff's claims is the claim to a right of privacy or as defendants classify it, Dr. Stehlik's "right to be left alone." Plaintiff's Vol. II, at 78. While there is no "right to privacy" specific guarantee in the Constitution, the Supreme Court has recognized that "zones of privacy" may be created by more specific constitutional guarantees which thereby impose limits upon government power. *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). In *Roe*, the Court held that the personal rights found in this guarantee must be limited to those which are "fundamental" or "implicit in the concert of ordered liberty" as described in *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). The activities detailed as being within this definition are very different and distinct from that for which plaintiff claims constitutional protection, i.e., matters relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976).

For the foregoing reasons and because this court views plaintiff's final claim under § 1983 to be without foundation, the court will grant defendants' motion for summary judgment on plaintiff's right to privacy cause of action.

2. *Antitrust Claims*

Plaintiff's antitrust claim is that defendants "monopolize[d] trade and commerce by boycott and exclusion of competitors." According to plaintiff, this conspiracy is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Plaintiff's Vol. II, p. 108. Plaintiff relies principally on the doctrine of "conscious parallelism" to establish the conspiratorial claims.

Defendants' motion for summary judgment on plaintiff's second cause of action is premised on the belief that plaintiff has failed to establish both the jurisdictional basis for, and the substantive elements of, a claim under the federal antitrust laws. Defendants vigorously disagree that their acts amount to a *per se* violation of the anti-trust laws, rather contending they must be evaluated under the "rule of rea-

son." As in all cases, this court will first consider the jurisdictional challenge.

### a. Jurisdiction

In *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), the Supreme Court while recognizing the breadth of the Sherman Act found

> jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an inter-relationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings and *if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings* either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce.

(emphasis added) *Id.* at 242, 100 S.Ct. at 509. In *McLain*, a plaintiff class comprised of real estate buyers and sellers during the four years preceding the filing of the complaint, sued two trade associations, six real estate firms, and a class of real estate brokers who transacted realty brokerage business in the greater New Orleans area. The private antitrust action under 15 U.S.C. § 1 alleged a continuing combination and conspiracy to fix, control, raise, and stabilize prices for the purchase and sale of residential real estate by the use of fixed commission rates, fee splitting, suppression of market information, and other anticompetitive practices.

Defendants sought to dismiss the complaint for lack of jurisdiction. In countering this motion, plaintiffs introduced the following evidence: (1) one savings and loan institution in New Orleans lent in excess of $100 million for local purchases of residential property, obtained capital out of state, and participated in the interstate secondary mortgage market; (2) an Arkansas corporation doing business in Louisiana, Mississippi, and Texas made in excess of $100 million in loans on residential real estate in New Orleans, which were primarily guaranteed by FHA or the VA; and (3) testimony of the President of a mortgage company indicated title insurance is required on all home loans and that nearly 30 title insurance companies, then writing coverage in New Orleans, were subsidiaries of a corporation in another state.

The district court granted defendants' motion to dismiss the complaint for lack of jurisdiction, because in its view "the inescapable conclusion to be drawn from the evidence is that the participation of the broker in these (presumably interstate) phases of the real estate transactions is an incidental rather than indispensable occurrence in the transactional chain of events." 432 F.Supp. 982, 985 (1977). The United States Court of Appeals for the Fifth Circuit affirmed. 583 F.2d 1315 (1978). In vacating the dismissal, the Supreme Court unanimously held that the defendants' brokerage activities substantially affected interest commerce so as to confer Sherman Act jurisdiction. The Court declared

> [t]o establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful. The validity of this approach is confirmed by an examination of the case law. If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect.

*Id.* at 242, 100 S.Ct. at 509.

The Ninth Circuit, after considering the *McLain* standard declared, "[u]nder

*McLain* it is unnecessary to establish that the alleged antitrust violations substantially affected interstate commerce, but when, as here, this effect is alleged, it is a strong indicator that the defendant's business has an interstate impact." *Western Waste Service Systems v. Universal Waste Control,* 616 F.2d 1094, 1097 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). In *Western Waste,* plaintiff garbage collection business brought suit against Universal Waste Control claiming Universal had attempted to monopolize the waste disposal business in Phoenix by undercutting prices below cost. The district court granted Universal's motion to dismiss for lack of subject matter jurisdiction, finding the garbage collection business was local in nature and did not affect interstate commerce. On appeal, the Ninth Circuit vacated this ruling. The court of appeals weighed the following facts:

> Both Western Waste and Universal acquire a substantial amount of their garbage collection equipment from out of state. All trucks and truck bodies were manufactured outside of Arizona and most of the rubbish containers purchased were also manufactured outside of Arizona. Some of the waste material which is collected by Universal is paper which is hauled to paper brokers in Phoenix for shipment out of state. Scrap wood is also collected by Universal and shipped to recyclers. Approximately four tons of such wood were sent by Universal to recyclers from June 1, 1976 to May 31, 1977. The recyclers make this material into wood chips which are shipped out of state.
>
> Both Western Waste and Universal are distributors of garbage compactors manufactured by out-of-state companies for sale or lease within Phoenix. In 1975, Western Waste became the Phoenix dealer of Blackwelder, a California manufacturer of compaction equipment. Blackwelder's compactor was new to the market and had unique features. Western Waste sent two of its employees to California for instruction in the selling and servicing of Blackwelder compaction equipment. In 1976 Universal used its market power and the power of its parent company to induce Blackwelder to terminate Western Waste's distributorship and choose Universal as its exclusive distributor. Subsequently, Universal advertised itself as Blackwelder's exclusive distributor in Phoenix.

.        .        .        .

> Universal spent $69,680 in 1975 and $356,061 in 1976 for equipment purchased out of state. Western Waste spent $88,335 and $124,007 during these respective years for out-of-state equipment.

.        .        .        .

> Finally, Universal finances almost all of its equipment purchases by borrowing from Waste Management in Illinois.

*Id.* at 1096, 1098, 1099. From these facts the court ruled that the garbage collection business sufficiently affected interstate commerce so as to fall within the protection of the Sherman Act and entitle plaintiff to go forward with its case. As a caveat, the court did state that "[i]t is possible that the evidence relied upon by Western Waste to establish jurisdiction at this stage will be rejected at trial by the finder of fact." *Id.* at 1099.

In *Hahn v. Oregon Physicians Service,* 689 F.2d 840 (9th Cir.1982) the Ninth Circuit expounded the point that "[a]t the jurisdictional stage plaintiffs need not make a more particularized showing that the allegedly unlawful restraint (in *McLain,* the alleged price fixing scheme) itself affects interstate commerce.... [I]f the plaintiff's interstate contacts are insubstantial, jurisdiction may also be established directly by the defendants' activities." *Id.* at 844. In sum, the rule in the Ninth Circuit, post-*McLain,* allows plaintiffs at the *pleading stage* to "establish federal jurisdiction merely upon a showing that the defendants' *general activities,* taken as a whole, occur in or affect interstate commerce." *Hayden v. Bracy,* 744 F.2d 1338, 1348 n. 2 (8th Cir.1984).

Since *McLain,* the federal courts have embarked upon a new and vastly expanded interpretation of the interstate commerce requirement under the Sherman Act. As a result the courts have been deluged with complaints alleging that a hospital's denial of a doctor's staff privileges constitutes a Sherman Act violation. *Marrese v. Interqual, Inc.,* 748 F.2d 373, 381 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985) (see cases cited therein). A common, albeit differently interpreted threshold issue which has been presented in each of the cited cases is whether a doctor's complaint alleges facts sufficient to satisfy the jurisdictional requirement of interstate commerce under the Sherman Act.

In *Furlong v. Long Island College Hospital,* 710 F.2d 922 (2d Cir.1983), a doctor brought a Sherman Act complaint against a physician, a professional corporation, and the hospital itself. The Second Circuit affirmed the dismissal of the complaint for failure to allege adequately the required connection to interstate commerce and ruled "plaintiff must show an effect upon interstate commerce resulting from defendant's unlawful conduct, either an effect that has already occurred or is likely to occur." *Id.* at 925.

> [I]t would not be prudent to extract from *McLain* a generalized rule that antitrust jurisdiction can be established simply by showing that some aspects of a defendant's business have a relationship to interstate commerce. Rather the inquiry must be whether the defendant's activity that has allegedly been "infected" by unlawful conduct can be shown " 'as a matter of practical economics' to have a not insubstantial effect on the intestate commerce involved."

*Id.* at 926, *citing McLain, supra,* 444 U.S. at 246, 100 S.Ct. at 511. The court in *Furlong* went on to find that while

> her complaint mentions "price-fixing" in a caption to her antitrust cause of action, she has not alleged the classic agreement between competitors that concerned the Court in *McLain.* There is no claim that

competing hospitals or associations of anesthesiologists have conspired to fix the prices for their services. In fact, there is no allegation of price-fixing in any of the operative language of the complaint. Though we do not doubt that a price-fixing conspiracy or a group boycotting scheme can be shown "as a matter of practical economics" to have an adverse effect on the perpetrator's interstate activities, this complaint fails to set forth any facts from which it is inferable that the defendants' activities, infected with the particular illegality alleged, are likely to have a substantial effect on commerce. That omission is not surprising, since it is not easy to imagine how the exclusion of Dr. Furlong from LIAA and the various harassments alleged to have prompted her withdrawal from the LICH medical staff might be shown to have a predictable tendency to restrict the defendants' purchase of supplies from out of state. Though we do not agree with Judge Sifton that defendants' activities are irrelevant as a matter of logic, we do, agree that the complaint in its present form fails to set forth facts from which the jurisdictional element, based on defendants' activities, is inferable.

*Id.* at 927. The Tenth Circuit in *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715 (10th Cir.1980) (en banc) emphasized a different test:

> [A]n elaborate analysis of interstate impact is not necessary at the jurisdictional stage, only an allegation showing a logical connection as a matter of practical economics between the unlawful conduct and interstate commerce. The emphasis was intended to be that a "particularized" showing is not necessary, not that a showing of a nexus between unlawful conduct and effect is unnecessary.... It is not necessary because even the purely local activity of a completely local business falls within the Act's reach if it appreciably affects a channel of commerce demonstrably interstate in character. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the

squeeze." *United States v. Women's Sportswear Manufacturers Association,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

Therein, the *Crane* court concluded that the trial court had prematurely dismissed a pathologist's Sherman Act complaint against a hospital owner and administrator for denial of staff privileges. *Id.* at 723–24. *Accord Shahawy v. Harrison,* 778 F.2d 636 (11th Cir.1985).

In *Cardio-Medical Ass'n v. Crozer-Chester Medical Center,* 721 F.2d 68 (3d Cir. 1983) four cardiologists claimed defendants had entered into contracts to prevent them from using defendants' specialized equipment, located in defendants' complex. These agreements allegedly restrained trade and monopolized the local market in violation of the Sherman Act §§ 1 and 2. The plaintiffs alleged that 12 to 15 percent of their patients were from out-of-state and that these patients accounted for $100,000 in annual revenues. Additionally, plaintiffs alleged that cardiological services require the use of large amounts of drugs and other medications, and that most of these products are manufactured out-of-state. While more allegations were set forth the court found the

> need [to] proceed no further, however, because we conclude on the basis of the allegations already described that plaintiffs have met their burden at this *stage of the pleadings.* Interference with the interstate travel of patients, the interstate payment of fees, and the interstate purchase of medication are well-recognized methods for demonstrating an effect on interstate commerce in antitrust litigation.

(emphasis added) *Id.* at 76. The *Cardio-Medical* court went on to quite broadly recognize that in reversing the dismissal of plaintiffs' complaint

> there is no reason why an enterprise engaged in nationwide anti-competitive conduct should not be subject to suit by a local victim simply because the defendant's conduct, as regards that particular plaintiff, does not affect interstate com-

merce. Moreover, there seems to be no reason why, as a matter of constitutional authority, Congress may not create a cause of action for wholly intrastate plaintiffs as part of a scheme to regulate anticompetitive conduct that otherwise affects interstate commerce.

*Id.* at 75.

The Seventh Circuit in *Marrese v. Interqual Inc.,* 748 F.2d 373, 383 n. 16 (7th Cir.1984) side-stepped the issue ["we need not reach the issue of whether the plaintiffs could rely upon the interstate business activities of defendant, Deaconess Hospital"] finding the following facts sufficient to establish jurisdiction at the pleading stage:

> [T]he plaintiffs' first amended complaint alleges that Dr. Marrese treats out-of-state patients; purchases medicine, equipment, and medical supplies from out-of-state purveyors; derives revenues from Medicare, Medicaid, and out-of-state private insurance companies; and pays management and accounting fees to out-of-state consultants. The plaintiffs' complaint further alleges that the impending revocation of Dr. Marrese's clinical privileges at Deaconness will prevent him from practicing orthopedic medicine in Evansville, Indiana or anywhere in the United States. Based upon these allegations, and the Federal courts' expansive interpretation of the interstate commerce requirement under the Sherman Act, it may be that the plaintiffs can demonstrate a substantial and adverse effect upon interstate commerce as a matter of practical economics.

*Id.* at 383.

The Eighth Circuit has criticized the Ninth Circuit rule believing "that the better rule is to require plaintiffs to show that the *challenged conduct* occurs in or affects interstate commerce." *Hayden v. Bracy,* 744 F.2d 1338, 1343 n. 2 (8th Cir. 1984). In *Hayden,* a doctor sued a hospital, its administrator, and twenty-one medical staff members alleging they conspired to form a group boycott against him and combined to assert monopoly power in vio-

lation of the Sherman Act. The district court granted defendants' motion for summary judgment on plaintiff's antitrust claim for failure of plaintiff to allege that their actions occurred in or affected interstate commerce. Hayden, as the plaintiff herein, apparently relied on the Ninth Circuit rule and claimed only that defendants' conduct affected interstate commerce. *Id.* at 1342. Hayden alleged

in his amended complaint that defendants' actions (1) substantially raise prices for out-of-state patients obtaining obstetrical-gynecological services in Jefferson County and (2) substantially increase the costs of out-of-state third parties, such as the federal government and private insurance companies, that pay for patients' medical care. Hayden supported these allegations with an affidavit in which he stated that he annually purchased $6,000 worth of office supplies from out-of-state vendors, and that he annually received over $100,000 (75% of his billings) from out-of-state insurance companies. Further, Hayden refers to the interrogatory answers of the hospital administrator indicating that the bills of 88% of the hospital patients were paid by third-party payors, 33% of which were Medicare payments.

Hayden contends that these allegations, together with other supporting evidence, were sufficient to withstand defendants' motion for summary dismissal. We disagree.

. . . . .

The uncontroverted evidence in this case simply shows that defendants required Hayden to attend ninety days of postgraduate education, and that they agreed to provide coverage so that he would be able to do so. As a matter of practical economics, this requirement does not substantially affect interstate commerce. Hayden's attendance at post-graduate courses would not substantially disrupt his practice because his colleagues agreed to cover for his patients. Consequently, medical services provided to Hayden's patients, the purchases of out-

of-state office supplies, and the reimbursements from third party payors would not be altered in any substantial amount. Defendants neither excluded Hayden from practice nor permanently denied him a chance to compete effectively. They simply required him to obtain additional training and improve his medical skills. Such a requirement cannot meaningfully be characterized as substantially affecting interstate commerce. *Id.* at 1342–43. Distinguishable in the *Hayden* case is the fact that the court was presented with a motion for summary judgment. The Ninth Circuit and other circuit cases cited herein all involved pleading stage motions to dismiss.

A recent Ninth Circuit district court opinion lends credence to the proposition that jurisdiction at the pleading stage may not equate to jurisdiction for purposes of summary judgment. In *Aron v. Michigan Health Care Corp.*, 600 F.Supp. 483 (D.Nev.1984) a doctor filed suit against defendant health care organization, community hospital, medical staff, and doctor alleging Sherman Act violations. (Ironically enough, Dr. Aron was an orthopedic surgeon attempting to establish a practice in the Incline Village, Nevada Ski area.) The bylaws of the particular hospital required the serving of a one year provisional period before new physicians were allowed to receive emergency room referrals. Additionally, the new physician had to be associated with a current member of the hospital's medical staff in that particular specialty. While Aron and a Dr. Herman had such a relationship, it ended prior to the expiration of the provisional period. Accordingly, Aron's emergency room privileges were terminated.

The trial court granted defendants' motion for summary judgment.

The materials submitted by plaintiff do not present any facts which connect the defendants' emergency room referral policy to interstate commerce or show that it has any substantial impact on it. The testimony only makes it clear that Lakeside is the only hospital in the coun-

ty with such a policy, and that such referrals are a method used by doctors to establish a practice in a new area. This does not push this case into the realm of interstate commerce.

The court by way of footnote added that while the doctor had been denied emergency room access, unless requested, "he has not been cut off entirely." *Id.* at 485 n. 2. In *Aron,* the district court focused on the connection between the alleged wrong and interstate commerce, rather than merely considering only the defendants' activities. *Hahn v. Oregon Physicians Service,* 689 F.2d at 844. Conceivably such a consideration was based on the fact that the case had progressed beyond the pleading stage.

Placing a somewhat confused area of the law aside for a moment, the court now turns to the declarations filed by respective counsel which address the issue of interstate commerce. Plaintiff's proof, submitted by Barry Ben-Zion, Ph.D., contains irrelevant and misleading data, which does not address how defendants' acts toward Dr. Stehlik affected or had a substantial impact on interstate commerce. The evidence is summarized as follows:

(a) 4.2 percent of patients listed on the emergency room register list their address out-of-state;

(b) 9 percent of the 1983 winter population and 10 percent of the 1984 winter population were visitors from out-of-state;

(c) 33 percent of adult patient days were paid for by Medicare and Medi-cal;

(d) While approximately $440,000 or 20 percent of $2,230,000 spent as direct expenditures, is spent for supplies, "there is little doubt that hospital supplies are produced by numerous companies" out-of-state;

(e) 3 percent of direct expenditures is spent on pharmaceuticals and 90 percent of pharmaceutical manufacturing firms are located out-of-state;

(f) 6.6 percent of direct expenditures is spent on radiology and not a single producer is located in California;

(g) Utilities by the hospital have out-of-state components;

(h) The hospital has equipment worth $672,000, with an excess of 80 percent of the manufacturers located out-of-state;

(i) 7.6 percent of direct expenditures were made on long-term liability interest payments which flowed through interstate financial intermediaries;

(j) Approximately 9 percent of the 1,378,000 skiers at Mammoth Mountain Ski area were from out-of-state;

(k) In excess of 48 percent of all skiers have annual incomes above $35,000;

(*l*) Mono County employment is almost totally dependent on tourism and recreation—about 60 percent of jobs are seasonal and transient. The hospital services this group of seasonal workers;

(m) From May '82 to May '83, 49 percent of patients at Mammoth were referred out-of-state;

(n) While there is no statistical difference in the number of surgeries performed by Dr. Stehlik after May 22, 1982, after Dr. Cole's arrival in November 1982 until May 1983, Dr. Cole performed 66 percent of all surgeries as compared to 33 percent for Dr. Stehlik;

(o) Mammoth Hospital was the only emergency medical facility within a 50 mile area;

(p) Dr. Stehlik's practice generated some $600,000 in net revenues per year. With Dr. Stehlik's life expectancy, the loss of net revenues is at least $7,335,000.

Defendant's expert, Michael Koehn, Ph.D., listed the following in his declaration to support his belief that Mammoth Hospital did not engage in interstate commerce.

(a) public liability insurance is obtained from a California company;

(b) worker's compensation insurance is obtained from the State of California;

(c) the pension fund management is obtained from the State of California;

(d) banking and investment services are obtained from banks in Mammoth Lakes;

(e) medical supplies are obtained through a shared California Group Hospital service in Fresno, California;

(f) drug and medicine is obtained from a pharmacy in Mammoth Lakes;

(g) all external auditing is performed by a certified public accountant in Mammoth Lakes;

(h) Mammoth Hospital is leased to a private hospital corporation in Los Angeles;

(i) Mammoth Hospital does not hold a monopoly as it has competed with the Alpine Medical Group both prior to the establishment of the hospital to the present and other hospitals as far away as Southern California provide medical services to patients injured at Mammoth Lakes;

(j) there is no single hospital market as the decedent had hospital staff privileges at three different hospitals;

(k) accounting for the increase in number of orthopedic surgeons in Mammoth Lakes, there is no statistical basis for the allegation that Mammoth Hospital foreclosed Stehlik from practicing or competing in Mammoth Lakes.

█ After a careful weighing of these factors, a review of the pertinent but conflicting case law, and the fact that defendants have postured a motion for summary judgment, this court finds that defendants' general activities as a matter of law neither occur in the flow of interstate commerce, or though wholly local in nature, substantially affect interstate commerce. Furthermore, as a matter of practical economics, the fact that Stehlik was put on probation and the hospital entered into contracts with other doctors, does not demonstrate a set of factors substantially affecting interstate commerce. The court views plaintiff's expert's declaration to the contrary to be conclusory and not supportive of a finding that the jurisdictional basis for a claim under the Sherman Act has been sustained.

While the court could terminate the discussion at this point and find that plaintiff has failed to establish the jurisdictional prerequisite for a claim under the Sherman Act, this court believes that because of the uncertainty and confusion demonstrated by the legal authorities a complete review of plaintiff's antitrust claim and the substantive elements of antitrust law is warranted.

b. *Sherman Act Section 1 Violation*

█ In order to establish a Sherman Act violation, a plaintiff must establish three elements: (1) a contract, combination, or conspiracy; (2) restraint of trade; and (3) an effect on interstate commerce.

1. *The Conspiracy*

Besides the named defendants, plaintiff accuses the following participants of having entered into a conspiracy to restrain trade and commerce under section 1 of the Sherman Act: (1) hospital board members; (2) Drs. Lovell, Cary and Cole; (3) David McCoy and Mammoth Mountain Ski Area; and (4) the deceased Dr. Matthews. Plaintiff's Vol. II, at 13. Plaintiff believes there was a "sequence and coordination of acts [by the alleged conspirators] and events which could not except by a near-miracle have occurred without a common purpose and as to much of the action, extensive coordination among the conspirators." *Id.* at 14. Plaintiff contends she has presented an abundance of circumstantial evidence to raise the inference of a "conscious parallelism" conspiracy theory.

" 'Conscious parallelism' cases illustrate that a complex pattern of behavior on the part of defendants must be shown in order to infer an agreement." *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1266 (9th Cir.), *cert. denied,* 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983), *citing, Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In *Interstate Circuit,* the leading case on conscious parallelism, a movie theatre chain sent a letter to eight distributors in which all of them were named as addressees and asked to comply with two demands to continue exhibition of first run films. The first demand was that they meet a schedule of minimum admission prices; the second demand was that they

not show first run films at night in conjunction with other films, the so-called policy of "double-features." The district court found that the distributors had agreed and conspired among themselves to take uniform action upon the proposals and carry out the restrictions, thereby depriving those unable or unwilling to accept the restrictions of any opportunity to exhibit first run-films. The restrictions operated to increase the income of the distributors and Interstate and deflect attendance from later-run exhibitors. Hence the acts constituted a combination and conspiracy in restraint of trade in interstate commerce in violation of the Sherman Act.

The Supreme Court affirmed noting that direct evidence of a conspiracy is the exception, rather than the rule. Rather the court was "compelled to rely on inferences drawn from the course of conduct of the alleged conspirators." *Id.* at 221, 59 S.Ct. at 472.

> It taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join, and we reject as beyond the range of probability that it was the result of mere chance.

*Id.* at 223, 59 S.Ct. at 473. *See also United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

In the Ninth Circuit, "conscious parallelism alone is insufficient to establish an inference of conspiracy." *Filco,* 709 F.2d at 1267, *citing, Syufy Enterprises v. National General Theatres, Inc.,* 575 F.2d 233, 236 (9th Cir.1978), *cert. denied,* 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1979); *C–O–Two Fire Equipment Co. v. United States,* 197 F.2d 489, 497 (9th Cir.), *cert. denied,* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952). Rather what is required is something additional, or a so-called "plus factor." *C–O–Two,* 197 F.2d at 497. Hence

conscious parallelism cases have additionally been "marked by one or more of the following: a proposal for joint action, a complex yet identical set of responses, direct communication or an opportunity for it, a failure to deny agreement, a set of circumstances which made each participant aware that it was in its interest to participate if all did, but adverse to its interest to participate if others did not." L. Sullivan, *Antitrust* 317 (1977). This policy is exemplified by Justice Clark's statement in *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 260, 98 L.Ed. 273 (1954), that " 'conscious parallelism' has not yet read conspiracy out of the Sherman Act."

The case which plaintiff presents is a far cry from the conscious parallelism cases with which this court is familiar. Plaintiff has presented evidence that the named defendants did act together and recommend probation for Dr. Stehlik and that some defendants did enter into exclusive contracts to provide anesthesiology, emergency room, and van ambulance services for Mammoth Hospital. These activities, however, amount to mere similarity in actions, without any showing that said actions would benefit all participants or that by not "participating" such defendants would befall adversity. Furthermore, there is a complete lack of showing that the fight between Dr. Matthews and Dr. Stehlik was "planned" by the alleged conspirators or that they acted together to bring about Dr. Stehlik's suicide. Such accusations have been totally unsupported by the evidence. The court accordingly would find that plaintiff has failed woefully short of establishing sufficiently similar conduct in the alleged matters. *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 884 (9th Cir. 1982).

Assuming that plaintiff has successfully demonstrated the requisite parallel conduct, the courts also require "that the plaintiff demonstrate that the alleged parallel acts were against each conspirator's self interest, that is that the decision to act was not based on a good faith business

judgment." *Zoslaw,* 693 F.2d at 884, *citing, Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. at 540–41, 74 S.Ct. at 259.

Here again the court finds that the defendants have come forth with more than sufficient evidence to establish that their acts benefited their self interests while at the same time advancing legitimate business decisions. The placing of the decedent on probation and requiring him to refrain from verbal or physical threats towards other members of the staff is justified by the obvious need for hospital members to work in a harmonious environment. The fact that the Hospital District contracted with Dr. Lovell to provide exclusive anesthesiologist services is a valid fiscal decision, considering the expense and need of a fifteen-bed hospital such as Mammoth. Furthermore, the decision to enter into an exclusive contract with Dr. Vawter to provide 24-hour coverage in the emergency room is a valid business decision, especially in light of the fact no other contract offered such coverage. Finally, the van ambulance contract between the Hospital District and Mammoth Mountain Ski Area is viewed as a valid exercise of the Hospital District's legislative power (*see* Cal.Health & Safety Code § 32121(*l*), each hospital district empowered to "acquire, maintain and operate ambulances or ambulance services within or without the district,") as well as a health necessity for those seriously injured and needing prompt medical attention.

Once allegations of a conspiracy, as here, have been rebutted by probative evidence showing alternative, legitimate business reasons for the defendants' conduct, to avoid summary judgment the plaintiff must come forward with specific factual support for it allegations. *Program Engineering, Inc. v. Triangle Publications,* 634 F.2d 1188, 1195 (9th Cir.1980). As the court noted, *supra,* because conspiracy is rarely susceptible of direct proof, a plaintiff must rely on circumstantial evidence. *Id.* Nonetheless,

[i]f [plaintiff] is to reach a jury at all, he must present sufficient evidence in addition to mere parallel conduct to warrant an inference that participants have reached accord. There is, in short, the central question whether, as a matter of law, the evidence is enough to support a conclusion that the participants have become a group acting together, rather than individual competitors who happen at the moment to be doing the same thing. Concerted action can be found only if the evidence as a whole warrants the conclusion that defendants have together chosen to act in a certain way, that they have, in one way or another, communicated, and given assurances, one to another.

L. Sullivan, *Antitrust* 317 (1977).

After over two years of discovery, plaintiff has come forward with only mere inklings, innuendos, and conclusory statements that the alleged conspirators "not only aimed to destroy, but largely destroyed [Stehlik's] right to build and operate, unmolested, unhumiliated and unharassed, the practice of medicine and surgery ... [and] succeeded spectacularly in the exclusion and destruction of those whom they deemed to be their competitors—a level of success only dreamed of by the ordinary violator of the federal antitrust laws." Plaintiff's Vol. I, at 13–14. The defendants vehemently deny their actions "were undertaken pursuant to an agreement or conspiracy to exclude or prohibit the practice of medicine by the decedent ..." *See* Declarations of James Vawter, M.D., Karen Tierney, M.D., Jeanne Standley (member of hospital district board), and Otis Clasby. Plaintiff's beliefs, without more, are simply insufficient to raise a genuine issue of material fact that a conspiracy existed amongst and between the named defendants and others. *Program Engineering,* 634 F.2d at 1195.

#### 2. *In Restraint of Trade*

The "in restraint of trade" language of section 1 of the Sherman Act has been analyzed under both the "rule of reason"

and the "per se" rule. The rule of reason "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). "The plaintiff must show injury to a market or to competition in general, not merely injury to individuals." *Fine v. Barry & Enright Productions*, 731 F.2d 1394, 1399 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). The Supreme Court has described *per se* violations of the Sherman Act "as agreement or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Plaintiff challenges the defendants' conduct only under the *per se* rule. Plaintiff maintains that the scuffle between Drs. Stehlik and Matthews, the placing of Stehlik on probation, the contracting of exclusive services by Mammoth Hospital District, and the eventual suicide of Dr. Stehlik evidences a concerted refusal to deal and a group boycott in violation of section 1 of the Sherman Act.

Thus far, the Supreme Court and the Ninth Circuit have applied *per se* analysis to four categories of restraints: horizontal and vertical price fixing, horizontal market division, group boycotts or concerted refusals to deal, and tying arrangements. *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1370 (9th Cir.1983). Nonetheless, not all alleged group boycotts or refusals to deal will be characterized as *per se* violations. Because the rule of reason is presumptively applicable except in extreme circumstances, the "per se rule's conclusive presumption of illegality is not applied to a challenged practice until 'experience with [the] particular kind of restraint enables the Court to predict with confidence that the rule of

reason will condemn it.'" *Cascade Cabinet*, 710 F.2d at 1370; *Maricopa County*, 457 U.S. at 344, 102 S.Ct. at 2473.

Thus, the type of conduct alleged as anticompetitive by the plaintiff (boycotting an orthopedic surgeon from practicing medicine at a hospital) could be considered a *per se* violation only after the courts have become familiar with the conduct and any anticompetitive effect it causes. While the Ninth Circuit has not addressed this issue, courts that have considered analogous situations have more often applied the rule of reason. *See Wilk v. American Medical Ass'n*, 719 F.2d 207 (9th Cir.1983); *Marrese v. The American Academy of Orthopedic Surgeons*, 706 F.2d 1488, 1495 (7th Cir. 1982) (an exception exists if the boycott is used to enforce agreements that are themselves illegal per se, i.e., price-fixing agreements); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d 1346 (7th Cir.1982); *Vuciecevic v. MacNeal Memorial Hospital*, 572 F.Supp. 1424, 1427–28 (N.D. Ill.1983); *McElhinney v. Medical Protection Co.*, 549 F.Supp. 121, 133 (E.D. Ky.1982). *Contra Weiss v. York Hospital*, 745 F.2d 786, 820 (3d Cir.1984) (albeit, admitting that in most cases involving exclusion from staff privileges, courts will have to utilize the rule of reason because it will be viewed as industry self-regulation.)

This court finds the Ninth Circuit is not well-versed with cases involving the regulation of health care by members of hospitals as well as the medical professions and hence cannot apply the *per se* rule. Even assuming the defendants' actions could be properly labeled as a group boycott, the court cannot find that they had such a potential for evil and harm to the relative competitive market for medical services so as to be classified as pernicious and without plausible redeeming virtues so as to require imposition of the *per se* rule.

Alternatively, this court has considered defendants' argument that the "learned professions" exception to the antitrust laws applies and finds it opportune. While the Supreme Court in *Goldfarb v. Virginia*

*State Bar,* 421 U.S. 773, 787, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975) recognized the "nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act," it did note the "public service aspect" as distinguished from a pure business aspect, "may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context be treated differently." *Id.* at 788 n. 17, 95 S.Ct. 2013 n. 17. Thereafter in *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 348–49, 102 S.Ct. 2466, 2475–76, 73 L.Ed.2d 48. (1982), the Court explained this exception by stating that conduct which is normally subject to a *per se* analysis will instead be subject to the rule of reason where the challenged conduct is "premised on public service or ethical norms." *Id.*

In the instant case, defendants have proffered evidence to establish that their challenged conduct was to maintain the medical standards at Mammoth Hospital and insure the peacefulness of staff members. This court is particularly convinced by the fact Dr. Stehlik never applied to be a contracting physician in the emergency room nor did the other doctors, until Dr. Cole's arrival, perform orthopedic surgery. Moreover, while placing Dr. Stehlik on probation achieved the goal of precluding him from harassing other medical staff practitioners, it did not affect Stehlik's clinical privileges in any way by the imposition of a stricter probation. As summarized by way of dicta in *Weiss,* 745 F.2d at 821 n. 60.

The "public service" function of a hospital is to provide for effective and efficient medical treatment for its patients. One factor in the effective and efficient running of a hospital is a medical staff that can work together and be courteous to patients and staff. Doctors who have a history of trouble in inter-personal relations can legitimately be excluded because, if admitted, they will reduce the effectiveness of the medical staff, thereby reducing the ability of the hospital to provide top-flight service. In sum, doctors who have trouble getting along with other people will reduce efficiency, thereby reducing the hospital's competitive position, and, therefore, exclusion of such doctors is pro-competitive and permissible under the rule of reason.

*Id.*

The rule of reason has been primarily directed to a balancing of the competitive evils of the restraint against the competitive benefits asserted on its behalf. *Gough v. Rossmoor Corp.,* 585 F.2d 381, 388–89 (9th Cir.1978). In evaluating anticompetitive market effect, the following factors should be considered: (1) the market area involved; (2) the nature of the particular industry product, or service involved; (3) the nature of the alleged restraint and its effect, actual or probable; (4) the reasons for adopting the particular practice which is alleged to constitute the restraint; and (5) the condition of the business before and after the restraint was imposed. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). *See Gough,* 585 F.2d at 389.

In the case at bar, the relevant market area may be defined as that area in which medical services are provided to those persons injured in the Mammoth Mountain Ski Area. The nature of the particular service is the furnishing of orthopedic medical services. The nature of the alleged restraint and its effect focuses, fatally in this court's view, solely on the effect defendants' alleged conduct had on Dr. Stehlik. While plaintiff's overall contention is that defendants' conspired to foreclose the medical market upon Dr. Stehlik, the evidence discloses that Stehlik retained his hospital privileges at Mammoth Hospital.[9] Hence, there never was a total restraint or boycott.

9. It is undisputed that throughout 1982, while Dr. Stehlik was on probation, he was the only orthopedic surgeon servicing the immediate area. *See* Plaintiff's Response to Interrogatory No. 179. Indeed, in pure pecuniary terms, the decedent's level of charges from May 1982 to the date of his departure from Mammoth Lakes in March 1983, remained undiminished save for October 1982 and in fact showed an increase in monthly terms for every month save June and October 1982.

From the foregoing, the court finds that plaintiff's attempt to adduce any evidence of the actual impact that defendants' allegedly unlawful conduct had on the relative competitive market is weak. Arguably, defendants' acts induced another orthopedic surgeon, Dr. Cole, to move to Mammoth Lakes in November 1982. While plaintiff admits there is no statistical difference in the number of surgeries Dr. Stehlik performed after being placed on probation, plaintiff's expert stated Dr. Stehlik performed only 33 percent of the surgeries, as compared to Dr. Cole's 66 percent in November 1982 through May 1983. Plaintiff postures no evidence on the issue of the probable effects on the relative market. Justifications for adopting the "restraints" have been discussed *supra*. Clearly defendants' acts can be justified by insuring the medical quality and care provided Mammoth Hospital patients remained high. Lastly no evidence has been presented which addressed the condition of medical services before and after the "restraints" were imposed in Mammoth Lakes.

To conclude, the court finds the impact of defendants' acts upon the relative competitive market for orthopedic medical services in the Mammoth Lakes Ski Area to be trivial. Plaintiff's attempt to establish a rule of reason violation fails for the same reason it would fail to establish a *per se* violation: there is no evidence of injury to competition or restraint of trade. Although plaintiff complains of the loss of her husband and his orthopedic medical practice, "economic injury to a competitor does not equal injury to competition." *Cascade Cabinet*, 710 F.2d at 1373. This court finds as a matter of law that plaintiff has failed to produce sufficient evidence to preclude the entry of summary judgment on the Sherman Act, § 1 claim. Accordingly, the court will grant defendants' motion for summary judgment on said claim.

### 3. *Pendent State Claims*

### (a) *Common Law Conspiracy*

Defendants seek summary judgment on plaintiff's common law conspiracy claim arguing there is no underlying tort or injury to support the conspiracy allegation. Plaintiff's common law conspiracy claim is that defendants and co-conspirators entered into a conspiracy to deprive Stehlik of his right to pursue his profession of orthopedic medicine, his privilege to use the hospital facilities at Mammoth Hospital, and to cause his membership at Mammoth Hospital to be terminated in order to benefit each member of the conspiracy. Third Amended Complaint, p. 32, line 23 through p. 33, line 12.

For a conspiracy to be actionable, "the alleged combination must result in the commission of a civil wrong, whether by the perpetration of an unlawful act or some injurious act by unlawful means, resulting in damage." *Younan v. Equifax, Inc.,* 111 Cal.App.3d 498, 508, 169 Cal.Rptr. 478 (1980). "In tort (as opposed to a criminal action) 'the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuring from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.'" *Michael R. v. Jeffrey B.,* 158 Cal.App.3d 1059, 1069, 205 Cal.Rptr. 312, 319–20 (1984). Mere acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability. *Wetherton v. Growers Farm Labor Ass'n,* 275 Cal.App.2d 168, 176, 79 Cal.Rptr. 543 (1969). While the gist of the crime of conspiracy is the agreement to commit the unlawful act, the gist of the tort is the damage resulting to the plaintiff from an overt act or acts committed pursuant to the common design. *De Vries v. Brumback,* 53 Cal.2d 643, 649, 2 Cal.Rptr. 764, 349 P.2d 532 (1960).

As discussed under the section entitled *The Conspiracy, supra,* at 61, there is insufficient indicia of a common law conspiracy amongst and between the defendants. At most, there is a weak showing of partial acquiescence on the part of some of

the defendants. Without a greater showing of cooperation or common design between the named defendants, plaintiff's claim must fall. Accordingly, defendants' motion for summary judgment on plaintiff's common law conspiracy claim is granted.

### (b) *False Imprisonment and Battery*

Plaintiff's claims for false imprisonment and battery arise out of the fight of Drs. Stehlik and Matthews on May 22, 1982. Plaintiff claims Dr. Matthews imprisoned Dr. Stehlik for the unlawful purpose of committing a battery upon his person. Defendants urge summary judgment on these claims based on the fact that plaintiff arguably will be unable to establish the substantive elements of these torts, since both combatants are dead and there are no witnesses to the fight.

False imprisonment "is the unlawful violation of the personal liberty of another .... The tort requires direct restraint of the person for some appreciable time, however short, compelling him to stay or go somewhere against his will." B.E. Witkin, *Summary of California Law*, § 214, p. 2498 (1974). A battery "is any willful and unlawful use of force or violence upon the person of another." *Witkin, supra*, at § 194, p. 2482.

The evidence proffered by the respective parties is replete with contradictory medical exhibits and diagnosis as well as postfight declarations. While from this evidence the court can adduce a scuffle ensued between two doctors, there is no evidence that the other defendants conspired to bring about the fight or that they arranged to falsely imprison Dr. Stehlik. Moreover, Dr. Matthews, now deceased, was never joined as a party defendant to this lawsuit. The one-year statute of limitations for commencing the battery and false imprisonment actions has long since expired. Cal.C.C.P. § 340(3). Accordingly, defendants' motion for summary judgment on plaintiff's claims of false imprisonment and battery is granted.

### (c) *Defamation*

Plaintiff's specific claims for defamation are that (1) defendants falsely told police officers and newspaper reporters that Stehlik assaulted and battered Matthews on May 22, 1982; (2) falsely told newspaper reporters that Stehlik had been placed on probation of his staff privileges at Mammoth Hospital, and (3) had written to the American Board of Orthopedic Surgeons that Stehlik had been placed on probation from his staff privileges at Mammoth Hospital. Third Amended Complaint, p. 40, lines 10–21. Defendants move for summary judgment arguing plaintiff's claim of defamation must fall as all statements made were true. Alternatively, defendants claim that the statements made were privileged under Cal.Civ.Code § 47.

Plaintiff has proffered no evidence that would support her conclusory allegations that said statements were in fact made. The newspaper accounts, as well as the police report of the May 22, 1982 incident between Drs. Stehlik and Matthews, indicate it had been a "mutual combat" situation and place no blame on either party. *See* Sheriff's Department Report, May 23, 1982, p. 8 ("Since I could not determine the validity of either statements, I listed both men as suspects and victims.") The newspaper stories indicate that Stehlik was put on one-year probation with specific instructions that he refrain from verbally or physically threatening other staff members. No mention of the denial of staff privileges is put in any newspaper account of the event. Finally, on the issue of whether any defendant informed the American Board of Orthopedic Surgery that Stehlik was on probation, plaintiff submits a letter dated April 1, 1982, addressed to Stehlik from a Henry H. Banks, M.D., which states in pertinent part:

> The Committee did not declare you eligible for the 1983 examination. This action was based on information received that you are currently on probation at Mammoth Hospital and because of questionable references received.

Defendants admit information was solicited by the Board from Drs. Parks and Tierney. On May 24, 1983, Dr. Tierney wrote a letter to the Board indicating effective May 24, 1983, "Dr. Stehlik has successfully completed the term of his probation."

■ Truth of the statements made is a complete defense against civil liability for defamation, regardless of bad faith or malicious purpose. B.E. Witkin, *Summary of California Law*, § 292 (1974); Restatement (Second) of Torts §§ 581–82. Here, all statements attributed to being made by the defendants are true. Plaintiff's allegation that defendants told the media or the American Board of Orthopedic Surgeons that his staff privileges had been terminated are unsubstantiated. Additionally, California law provides that

[a] privileged publication or broadcast is one made—

3. In a communication, without malice, to a person interested therein, (1) by one who is also interested or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for communication innocent, or (3) who is requested by the person interested to give the information.

Cal.Civ.Code § 47(3). The scope of the privilege under said section "is not capable of precise or categorial definition, and ... its application in a particular case depends upon the evaluation of the competing interests which defamation law and privilege are designed to serve." *Institute of Athletic Motivation v. University of Illinois*, 114 Cal.App.3d 1, 11, 170 Cal.Rptr. 411 (1980). The Restatement (Second) of Torts, § 595 in formulating a general rule, suggests that an occasion is conditionally privileged "if the circumstances induce a direct or reasonable belief that (a) there is information that affects a sufficiently important interest of the recipient or a third person, and (b) the recipient ... is a person to whom its publication is otherwise within the generally accepted standards of decent conduct." In addition, a privilege exists "if the circumstances lead any one of several

person having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." *Id.* at § 596.

■ The circumstances under which information was sought about the May 22, 1982 incident and the subsequent probation of Dr. Stehlik by the police, media, and Board clearly make any statements qualifiedly privileged within the meaning of subdivision three. All three entities were legitimately "interested" in the scuffle as well as the subsequent probation. *See, e.g., Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093, 1102 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982), (bank president's alleged slander of a bank employee which occurred at a meeting held at the request of the employee's friend who sought to intervene on employee's behalf in his termination by the bank and attended by the employee's acquaintance who played an active role in seeking employee's reinstatement was qualifiedly privileged under Cal.Civ.Code § 47(3)). In the small town of Mammoth Lakes, the police and the media had a right to inquire and know about the matter to insure the safety of the combatants as well as to inform the public. Furthermore, the hospital had a medical obligation to inform the Board of Stehlik's probationary status.

While this privilege is not absolute, plaintiff has presented no evidence of malice or bad faith, i.e., excess publication, publication for an improper purpose, or defamation beyond the group interest, which might defeat it. *Bollow*, 650 F.2d at 1102; *Athletic Motivation*, 114 Cal.App.3d at 12, 170 Cal.Rptr. 411. Accordingly, this court finds all of defendants' alleged defamatory statements to be conditionally privileged and will, accordingly, grant summary judgment in defendants' favor on plaintiff's claim of defamation.

(d) *Interference with Prospective Business Advantage*

■ Lastly, defendants assert plaintiff cannot establish the disruption of a specific

economic relationship existing between the decedent and third parties to entitle plaintiff to relief. Defendants point specifically to the fact that Dr. Stehlik did not suffer any decrease in income nor was his existing contractual relationship with Alpine Clinic affected by defendants' actions. Plaintiff's tortious claim is that Dr. Stehlik benefited from two prospective economic advantages, to wit: (1) "board eligible" orthopedic surgeon and (2) associate in the Alpine Medical Group. Third Amended Complaint, at 43, lines 4–10. Plaintiff alleges defendants conspired to induce Stehlik to move from Mammoth Lakes to Carlsbad, California which medical practice was "totally unsatisfactory both professionally and financially." *Id.* at 44, lines 12–12. Plaintiff further claims that defendants diverted potential orthopedic patients of Dr. Stehlik to themselves and through "illegal conduct" caused Stehlik's name to be "stricken from the list of 'board eligible' physicians of the Board of Orthopedic Surgeons and become ineligible for testing." *Id.* at 43–44.

Viewing the evidence as a whole this court is convinced that plaintiff's tortious interference claim cannot be established and hence defendants are entitled to summary judgment. While plaintiff has presented evidence showing the existence of an economic relationship between Stehlik and injured skiers at Mammoth Lakes, she has failed to come forward with a showing that there was an actual disruption of this relationship and that Stehlik was damaged. There is no evidence to support the claim that patients would not go to Stehlik if he was not granted board certification. To the contrary, it appears injured skiers utilized his services regardless of his credentials. Furthermore, there is no evidence that Stehlik was injured in his relationship with the Alpine Group, had any decrease in monthly income, or was induced to move to Carlsbad. (*See* note 9, *supra*) While Stehlik was denied eligibility for the 1983 board exam, he had the opportunity to reapply, especially after his probationary status was withdrawn in May 1983. Lastly, plaintiff's claim that defendants diverted patients to themselves is

without merit, as defendants did not practice orthopedics. Accordingly, this court will grant defendants' motion for summary judgment on plaintiff's claim for interference with a prospective business advantage.

### 4. *Conclusion*

For the foregoing reasons, and good cause appearing,

IT IS HEREBY ORDERED THAT:

(1) defendants' motion for summary judgment on plaintiff's claims for interference with Dr. Stehlik's liberty and property interests without due process of law and violation of Dr. Stehlik's right to freedom of expression under 42 U.S.C. § 1983 be DENIED;

(2) defendants' motion for summary judgment on plaintiff's claims for illegal seizure, right of counsel, right to travel, deprivation of life, cruel and unusual punishment, equal protection, and right to privacy under 42 U.S.C. § 1983 be GRANTED;

(3) defendants' motion for summary judgment on plaintiff's claim for violation of the Sherman Act, 15 U.S.C. § 1 be GRANTED;

(4) defendants' motion for summary judgment on plaintiff's pendent state claims of common law conspiracy, false imprisonment, battery, defamation and interference with a prospective business advantage be GRANTED.

IT IS SO ORDERED.